THE NATIONAL CITY BANK OF CLEVELAND, TRUSTEE,
APPELLEE, *v.* MITCHELL ET AL., APPELLANTS.

(No. 28520—Decided February 29, 1968.)

*Messrs. Hahn, Loeser, Freedheim, Dean & Wellman.*
for appellee.

*Mr. David J. Hopkins, Messrs. Sanders, Sanders, Cow-an & Russell* and *Messrs. Cavitch & Hoehnen,* for appellants.

CORRIGAN, C. J. This appeal by the defendants arises out of an action for declaratory judgment brought by the National City Bank of Cleveland, as trustee of the estate of Charles Godman, in the Court of Common Pleas of Cuyahoga County. The bank sought a declaration of rights as to who was legally entitled to the proceeds of one portion of that estate, namely, the portion designated for the "lawful issue" of John Godman, son of the settlor. The trial court decided that John Godman's sons by adoption should not be considered as such "lawful issue."

The point of decision in this case rests upon the interpretation of Charles Godman's trust agreement, and especially a 1933 modification of that agreement. In the original trust instrument, executed in 1924, Charles Godman established a life estate for his widow with remainder in income to his two children, John and Helen, in equal shares. After the deaths of John and Helen, the principal from their respective portions was to vest in their "lawful issue." At that time, John Godman, the son, was thirty-one years old and childless. Later modifications were made in 1926, 1929, 1933 and 1935. The first and last changes had no bearing on this case. In 1929, however, the settlor redivided his trust estate in order to provide for the children born to his daughter, Helen. The 1929 modification reduced John's and Helen's portions from one-half to two-fifths each and set aside a one-fifth portion for the two grandchildren. In 1933 Charles Godman again modified the trust agreement by changing the shares of his two children from two-fifths to one-third each. By this time John Godman had been divorced from his second wife and was still childless. Then, in 1934, John Godman married his third wife, a widow who had two children, ages seven and four, born to her during her first marriage. John Godman adopted these two children of his third wife in 1938, four years after his marriage to their mother, and nearly two years after the death of the settlor, Charles Godman.

The narrow question we must decide is whether those two children, who were adopted after the death of the set-

tlor, constitute "lawful issue" within the meaning of the 1933 modification agreement. It reads as follows:

"In the event of the death of my said son leaving lawful issue him surviving, said net income shall be paid to or for the benefit of such lawful issue in equal shares per stirpes, in quarterly installments or oftener, and in the event of the death of any of such lawful issue of my said son leaving surviving heirs of the body, then such surviving heirs of the body shall receive the share to which such deceased issue would have been entitled if living. * * *"

This court has had the advantage of exhaustive, scholarly briefs from both sides and the benefit of oral orgument from learned counsel urging the opposing views of the issues posed. We also had the benefit of a carefully prepared memorandum of opinion by the able trial judge.

Error is assigned by appellants, defendants below, as follows:

1. The Common Pleas Court erred in holding that the defendants, Robert Clare Godman and John Fletcher Godman, are not "lawful issue" of John N. Godman within the meaning of subdivision IV 3. B. (a) of the relevant Trust Agreement.

2. The Common Pleas Court erred in holding that the John Godman portion of the relevant trust estate should be added to the Charles A. and Patricia Wallace portion of the trust estate to be held and distributed thereunder.

Whether the two adopted children of John Godman constitute "lawful issue" within the meaning of the 1933 modification agreement depends upon the intent of the settlor. As stated in 4 Page on Wills (1961 Ed.), Section 30.6:

"The sole purpose of the court in construing a will is to ascertain the actual intention of the testator as the same appears from a full and complete consideration of the entire will when read in the light of the surrounding circumstances. * * *"

The intent must be gathered from the language used, the general scheme of disposition employed, and from the circumstances surrounding the making of the instrument,

*Jones* v. *Lloyd* (1878), 33 Ohio St. 573; *Casey* v. *Gallagher* (1967), 11 Ohio St. 2d 42; Schouler, Wills (6 Ed., 1923), Section 937. Also, the statutes which fix the rights of adopted children to inherit become pertinent if the settlor's intent is unstated or ambiguous. *Third Natl. Bank & Trust Co.* v. *Davidson* (1952), 157 Ohio St. 355, 366; *Everhard* v. *Brown* (1945), 75 Ohio App. 451; 2 American Jurisprudence 2d 934, Adoption, Section 92; 86 A. L. R. 2d 33, Section 9; *Burleigh Estate* (1961), 405 Pa. 373, 175 A. 2d 838.

Appellants argue that the 1932 adoption statute (Section 10512-19, General Code [114 Ohio Laws 320, 474], now Section 3107.13, Revised Code) controls the instant case in that it created a rule of construction favorable to adopted children. They suggest that an inheritance which involves an adopted child must be construed with reference to this statute, unless the testator takes positive action, such as employing the words suggested in the statute— "heirs of the body"—to avoid its effects. The 1932 adoption statute reads as follows:

Section 10512-19, General Code, *supra*:

"Except when such child is adopted by a step-father or a step-mother according to law, upon such decree of adoption the natural parents of the child, if living, shall be divested of all legal rights and obligations due from them to the child or from the child to them; and the child shall be free from all legal obligations of obedience or otherwise to such parents; and the adopting parent or parents of the child shall be invested with every legal right in respect to obedience and maintenance on the part of the child as if said child had been born to them in lawful wedlock; and the child shall be invested with every legal right, privilege, obligation and relation in respect to education, maintenance and the rights of inheritance to real estate, or to the distribution of personal estate on the death of such adopting parent or parents as if born to them in lawful wedlock; provided, such child shall not be capable of inheriting property expressly limited to the heirs of the body of the adopting parent or parents; but shall be capable of inherit-

ing property expressly limited by will or by operation of law to the child or children, heir or heirs at law, or next of kin, of the adopting parent or parents, or to a class including any of the foregoing and provided also, on the death of the adopting parent or parents and the subsequent death of the child so adopted, without issue, the property of such deceased parent or parents shall descend to and be distributed among the next of kin of said parent or parents and not to the next of kin of the adopted child; and provided, also, if such adopting parent or parents shall have other child or children, then the children by birth and adoption shall, respectively, inherit from and through each other as if all had been children of the same parents born in lawful wedlock. Nothing in this act shall be construed as debarring a legally adopted child from inheriting property of its natural parents or other kin.''

There are several reasons why, in our opinion, Section 10512-19, General Code (114 Ohio Laws 320, 474), now Section 3107.13, Revised Code, does not control the instant controversy. First, as admitted by appellants, the ''heirs of the body'' provision in the statute does not express the *only* way in which adopted children could be excluded. Otherwise, even a clear statement in a will, such as ''adopted children are hereby excluded,'' would have to be declared a nullity since it would not literally comply with the statute. Also, the history of the clause shows that it was originally designed to prevent individuals from using an adopted child to gain control of a fee tail estate, and not to prevent testators from disinheriting them. Oler, ''Construction of Private Instruments Where Adopted Children are Concerned: II,'' 43 Michigan Law Rev. 901 (1945); Comment, 17 Ohio St. Law Journal 335 (1956). In addition, it is apparent that Section 10512-19, General Code, *supra* (now Section 3107.13, Revised Code), does not mention the crucial phrase in this controversy, ''lawful issue,'' although it does provide for ''child or children,'' ''heir or heirs at law,'' and ''next of kin.'' Finally, even if Charles Godman or his lawyer is presumed to have drafted the 1933 modifi-

cation agreement in full knowledge of the law at that time, and its implications, it is arguable that the 1932 adoption statute would not apply. That statute was prefaced with the exclusion, "Except when such child is adopted by a step-father or step-mother * * *." Presumably step-children, as contrasted with ordinary adoptees, were not included. Not until 1955 did the Legislature see fit to clarify that clause by a further amendment. So even if Charles Godman had foreseen that his son John might adopt the children of his new wife, it is unlikely that he would have foreseen the applicability of Section 10512-19, General Code, *supra,* to the adopted sons of John.

Appellants strongly urge, however, that the 1932 adoption statute creates a presumption of inclusion for adopted children unless an affirmative statement of exclusion is contained in the trust instrument. They cite *Dollar Savings & Trust Co.* v. *Musto* (Mahoning County Court of Appeals, 1961), 88 Ohio Law Abs. 62, among other cases, in support of this proposition. In that case the testatrix's will, drafted in 1937, established a trust for her son Charles for his life, remainder to his two children. The will provided further that if there were any other "issue of my son * * * surviving," then such issue were to be included as beneficiaries. Sixteen years after his mother's death, Charles adopted the natural daughter of his second wife. When Charles died he was survived by his two natural children and his adopted daughter. The court decided that the adopted daughter should be considered an "issue" and therefore should share the trust proceeds equally with Charles' natural children. The court in that case relied on three factors: (1) The 1932 adoption statute was in effect when the will was drawn; (2) "issue" is not synonymous with "heirs of the body"; (3) the testatrix had shown that she was not concerned with bloodlines since she had established, by special provision, a life estate in the income of the trust corpus for her son's first wife. This provision, incidently, never took effect because it was contingent upon the first wife remaining married to Charles. That wife, how-

ever divorced Charles subsequent to the death of the testatrix.

In the case at bar the only evidence of a departure from an intent to follow bloodlines is a provision in the settlor's trust agreement giving a two hundred dollar-a-year annuity to John Godman's brother-in-law. Unlike in *Musto,* this provision for a nonrelative represents a nominal charge when measured against the corpus involved. Also unlike in *Musto,* the settlor in this case used not only "lawful issue" but also "heirs of the body" when describing his ultimate beneficiaries. Finally, it is significant that the testatrix in *Musto* drafted her will several years after the 1932 adoption statute had gone in effect, whereas in this case the settlor drafted the original instrument in 1924 and added amendments, written in similar language, in subsequent years.

If any presumptive rule exists in Ohio in this matter it is to the effect that an adopted child is deemed excluded from a class of beneficiaries when the testator was a stranger to the adoption and had not otherwise manifested an intent to include adopted children. *Third Natl. Bank & Trust Co.* v. *Davidson* (1952), 157 Ohio St. 355. In the *Davidson case,* which involved Section 10512-19, General Code, *supra* (now Section 3107.13, Revised Code), the Supreme Court declared, at page 366:

"* * * in bequeathing or devising property by will it is presumed that a testator who has not been a party to any adoption proceedings prefers his own blood relatives to strangers; * * *."

Despite criticism of the "stranger to the adoption rule," it is still the law of Ohio, and the majority rule in the United States. *Albright* v. *Albright* (1927), 116 Ohio St. 668; *Third Natl. Bank & Trust Co.* v. *Davidson* (1952), 157 Ohio St. 355; 1 Ohio Jurisprudence 2d 651, Adoption of Children, Section 27; 56 Ohio Jurisprudence 2d 155, Wills, Section 622; 86 A. L. R. 2d 116; Halbach, "The Rights of Adopted Children Under Class Gifts," 50 Iowa Law Rev. 971, at 976 (1965); Oler, *op. cit., supra,* at pp. 914-916.

It is true that certain states have recently passed rules of construction, in addition to their adoption statutes, which create a presumption of inclusion for adopted children. Illinois' statute is typical:

"For the purpose of determining the property rights of any person under any written instrument executed on or after September 1, 1955, an adopted child is deemed a natural child unless the contrary intent plainly appears by the terms thereof." Ill. Rev. Stats., Chapter 4, Section 11-12 (1953).

Also, see, Massachusetts General Laws, Chapter 210, Section 8 (1958); New York Estates, Powers and Trusts Laws, Section 2-1.2 (1967); New York Decedents Estates Law, Section 49 (1964); N. J. S. A. 9:3-30 (1958). These statutes, however, are in no way similar to Ohio's 1932 adoption statute or its successor.

It appears, therefore, that the 1932 adoption statute (Section 10512-19 General Code, *supra*) does not create the rule of construction found in such states as Illinois and New York. Thus, there is no presumption in Ohio that an adopted child must be included unless affirmatively excluded by language in the instrument. In a given case, the adoption statute may be pertinent, but only insofar as the intent of the settlor is not otherwise clear. It is our determination that the intent of the settlor in this case is clear.

The primary indicator of the settlor's intention is the language used in the trust instrument. In the 1933 modification agreement, the settlor refers to "lawful issue" and to "heirs of the body." In that amendment, and in later amendments, "lawful issue" is used to describe third-generation beneficiaries, while "heirs of the body" describes fourth-generation beneficiaries. The apparent purpose in using these different terms is to keep distinct and separate the references to different generations. Since the 1933 modification substantially expanded the basic plan, so that remote generations were affected, this reference system was necessary. Appellants suggest that the settlor might have foreseen the adoption, after his death, of the two step-children and, in an effort to allow for them, used

language which permitted adopted children to take in the third generation but not in later generations. It is more logical to assume that the settlor used the two phrases synonymously and was thinking only about ease of reference when drafting his trust plan. For example, on page nine of the 1933 modification agreement, he again uses "issue" when referring to fifth-generation beneficiaries.

The traditional meaning of "lawful issue" and "heirs of the body" is lineal descendants by blood. *Casey* v. *Gallagher* (1967), 11 Ohio St. 2d 42; *Third Natl. Bank & Trust Co.* v. *Davidson* (1952), 157 Ohio St. 355; *Krieger* v. *Stauffer* (Common Pleas, 1946), 34 Ohio Op. 365; 1 Ohio Jurisprudence 2d 651, Adoption, Section 27; 2 American Jurisprudence 2d 934, Adoption, Section 92. In several cases in Ohio and elsewhere, and particularly in recent years, the meaning of "issue" has been expanded to include adopted children. *Flynn* v. *Bredbeck* (1946), 147 Ohio St. 49; *Dollar Savings & Trust Co.* v. *Musto* (1961), 88 Ohio Law Abs. 62. This trend, however, never has affected "heirs of the body," which still means lineal descendants by blood. 86 A. L. R. 2d 122; 2 American Jurisprudence 2d 939, Adoption, Section 98. Furthermore, there is little doubt that, prior to 1932, the date of the adoption statute, "issue" meant "heirs of the body" in adoption cases. *Albright* v. *Albright* (1927), 116 Ohio St. 668; *Rogers* v. *Miller* (1932), 43 Ohio App. 198. This latter case, in fact, was the latest pertinent authority when Charles Godman died in 1936. Therefore, even if Charles or his lawyer had reviewed the case law immediately prior to his death, he would not have been led to suspect that the term "lawful issue" had gained a new and expanded meaning. The effect given by courts to changes in the law in this situation has been explored by Oler, *op. cit., supra,* at 919-920:

"If the instrument-maker deliberately or with indifference cast the determination of the takers upon the law as it might stand at the later date, it seems clear that the circumstance of the original statutory setting should not be treated as significant. * * *

"The weight of authority is to the effect, however, that

if the instrument reveals no such inclination to let the law take its course, but employs a term of description such as 'children' or 'issue,' which at the time the instrument is executed and becomes effective has a meaning exclusive of adoptees, the fact that by subsequent statute an adoptee is elevated to the status of a child or issue of the adopter will not alter the exclusionary force of the designation as it was used in the instrument. * * *"

While the wisdom of this rule may be open to some argument, it should certainly apply in a situation in which the testator's intention was formulated under a clear statutory and judicial rule which gradually evolved, at a later date, to a different state of law.

Thus, the logical and probable conclusion is that Charles Godman intended to use the words "lawful issue" and "heirs of the body" in their traditional, common meaning, and meant to insure that his property devolved to his natural descendants. In short, as expressed in the opinion of the trial court, "it is inconceivable that the settlor should concern himself with the bloodline of the fourth generation and not the third."

A study of the evolution of the trust plan leads to a similar conclusion that the settlor intended to limit his inheritance to blood relatives. As noted, the original 1924 trust agreement provided for an equal division of the trust between John Godman and his sister, Helen. By the time of the third modification in 1933, when John was forty years old and still childless, his share was cut to one-third, while the portion to Helen's children, Charles and Patricia Wallace, was increased to one-third. More significantly, in both the second and third modifications, there was no provision for the vesting of a remainder interest in the John Godman portion, other than a general vesting clause, applicable to all portions, which was designed to ward off application of the rule against perpetuities. A separate, additional vesting clause, however, applied to the Charles and Patricia Wallace portion of the trust. This clause provided for the vesting of corpus, at various times, in certain members of that class.

From the record we assume that Charles Godman was aware of his son's diminishing likelihood of producing offspring and meant to direct his money away from that line of the family and into the line which included his grandchildren and which promised future offspring. In fact the whole 1933 modification agreement, with its elaborate, far-reaching provisions, reveals a special concern for the Charles and Patricia Wallace portion of the trust, more so than for the other portions. The changes in the trust plan, coupled with the wording used, lead to a conclusion that the settlor was deeply concerned with his bloodline and desired to preserve and maintain it.

For the reasons stated, assignments of error Nos. one and two are overruled, and the judgment of the Court of Common Pleas is affirmed.

*Judgment affirmed.*

WHITE and ARTL, JJ., concur.