IN THE MATTER OF THE ACCOUNTING OF GERALDINE L. THOMPSON, LEWIS S. THOMPSON, JR., DECEASED, AND ELISABETH T. BABCOCK, AS TRUSTEES OF THE TRUST ESTABLISHED UNDER PARAGRAPH THIRD OF THE LAST WILL AND TESTAMENT OF LEWIS S. THOMPSON, DECEASED.

Argued September 26, 1968—Decided February 18, 1969.

*Mr. Arnold B. Levin* argued the cause for appellant, Roger Boone (*Mr. Donald J. Pappa,* of counsel; *Mr. Thomas L. Yaccarino,* on the brief; *Messrs. Pappa, Yaccarino & Widman,* attorneys).

*Mr. Stuart A. Young, Jr.,* argued the cause for respondent Peter van Gerbig (*Mr. W. Barton Leach,* of the Massachusetts Bar, of counsel and on the brief).

*Mr. John Warren, Jr.,* argued the cause for respondent Surviving Successor Trustee, Elisabeth T. Babcock (*Mr. John B. Jessup,* of the New York Bar, of counsel; *Messrs. Parsons, Canzona, Blair & Warren* and *Messrs. Winthrop, Stimson, Putnam & Roberts,* of the New York Bar, attorneys).

*Mr. Henry E. Kordes* argued the cause for guardian *ad litem.*

The opinion of the court was delivered by

WEINTRAUB, C. J. The question is whether a testamentary gift to "lawful issue" of the testator's daughter includes a

child adopted by the daughter after the testator's death. The trial court held the adopted child did not take. We granted certification before argument in the Appellate Division.

The will was executed in 1935. The testator died the next year, survived by four natural children. One of them, Geraldine, had a natural child, Peter van Gerbig, and in 1943, seven years after the testator's death, Geraldine and her then husband, Rowan Boone, adopted an infant, Roger Boone. The immediate quarrel is between Peter, the natural child of Geraldine, and his adopted brother, Roger.

The will provided for the payment to testator's widow of the sum of $50,000 per year out of income, the remaining income to be divided equally among testator's "issue surviving * * * in equal shares *per stirpes* and not *per capita.*" The testator directed that upon his widow's death the *corpus* be divided into shares, one for each of his children with the issue of a deceased child taking the parent's share *per stirpes,* and that upon the child's death, the child's share be paid "to the issue of such child him or her surviving, their heirs and assigns absolutely and forever in equal shares *per stirpes* and not *per capita.*"

In 1948 the trustees filed their first intermediate account. The testator's widow was still alive and so also was the daughter Geraldine, mother of Peter van Gerbig and of Roger Boone. The New York law firm which had prepared the will and was counsel for the trustees sought advice from New Jersey counsel as to whether Roger Boone was a party in interest and was advised that an adopted child would not be regarded as "issue." Upon that advice Roger was not joined in the accounting.

In 1949 the daughter Geraldine died. On the basis of the advice just mentioned, the trustees thereafter paid her share of excess income to her natural child, Peter, and none to her adopted child, Roger. In 1950 Rowan Boone, adoptive father of Roger, consulted his own counsel as to whether Roger was entitled to take under the will, and by letter counsel advised that Roger was not "issue" and hence had no

interest. Rowan Boone sent a copy of the letter to New York counsel for the trustees.

The trustees continued the income payments to Peter until March 1967 when they filed their second intermediate account and expressly sought a determination of the interest of Roger and also of certain infants who are adopted great-grandchildren of the testator. In September 1967 testator's widow died, and thereupon the one-fourth of the *corpus* became payable to the "issue" of the daughter, Geraldine. Thus the controversy between Peter and Roger ripened with respect to the *corpus* as well.

Roger presses no claim against the trustees or Peter as to any payment already made, but asserts a claim to one-half of Geraldine's share of *corpus* and the retained income thereon. As we have said, the trial court found for Peter.

There is nothing within the will itself to indicate the testator thought of the problem and entertained a view as to whether an adopted child should take. Nor is there anything in the surrounding circumstances evidencing an awareness of the question. At our request the New York law firm which prepared the will submitted its entire file with respect to its preparation. The parties agreed that the record be deemed supplemented thereby. The file discloses no mention of the question whether an adopted child should take. The communications between the testator and the draftsman (now deceased) were only in terms of "children" and "grandchildren." And although the file shows that several questions of New Jersey law were researched in the preparation of the will, there was no mention of the meaning of "issue" generally or under New Jersey law. The file suggests strongly that the draftsman first looked into the subject in 1946 when the testator's widow raised the question.[1] We are

---

[1] Counsel's letter to Mrs. Thompson dated July 16, 1946 states that "In compliance with your request, we have looked into the New Jersey law as to whether the word 'issue' when used in a Will or Trust Instrument to describe persons who take thereunder includes a person who is adopted by the life beneficiary or any

satisfied that no inquiry as to whether under New Jersey law "issue" would include an adopted child was made until 1946 and then again in 1948, when, as noted above, confronted with the fact that an adoption had occurred, counsel sought the opinion of a New Jersey lawyer.

I

This litigation was undoubtedly prompted by *In re Coe,* 42 *N. J.* 485 (1964). There the testatrix made a bequest to the "lawful children" of a girl for whom she felt the affection of a mother, and the question was whether two children that girl adopted years after the death of the testatrix were such "lawful children." We held they were, and expressly disapproved of a contrary *dictum* in *In re Wehrhane,* 23 *N. J.* 205 (1957).

In the present case the pivotal words are "issue * * * *per stirpes"* rather than "lawful children" involved in *Coe.* We said in *Coe* that we would find no difference between such terms, but since there had been prior decisions in our State holding that "issue" presumptively connoted a blood relationship, we would reserve the question whether because of reliance in fact upon such decisions there might be special equities precluding the application of what we are satisfied is the correct principle of law. We said, 42 *N. J.,* at 494–495:

"Frankly we would not, as an original matter, distinguish among issue, descendants, children, and heirs, since ordinarily the word is not selected by the testator but rather by the scrivener, who, if he were conscious of the question whether adopted children should

remainderman under the instrument." His opinion was that as a general rule an adopted child would not be included, and cited *In re Fisler,* 131 *N. J. Eq.* 310 (*Prerog.* 1942), affirmed, 133 *N. J. Eq.* 421 (*E. & A.* 1943), to which case we will refer later. However, he cautioned that where the adoption antedated the instrument, the result could be otherwise, citing *In re McEwan's Estate,* 128 *N. J. Eq.* 140 (*Prerog.* 1940), and therefore advised that her own will and testament state explicitly whether an adopted child shall benefit.

be in or out, would elicit the testator's wish and express it un-
equivocally. The cases at most attributed but *prima facie* meaning
to such words, and a competent draftsman would not deliberately
pick a word which instead of controlling the context is easily colored
by it. The caveat against that course has been unmistakable. An-
notation, 86 *A. L. R.* 2d 12, 19 (1962).

But the immediate question is whether an equity might be shown
in some circumstances with respect to the word 'issue' in light of
our prior cases and perhaps also in light of the fact that *L.* 1953,
*c.* 264[2] which we just quoted overturned the judicial view of issue
prospectively only. As to the effect of prospective legislation upon
the judiciary's responsibility for pre-existing situations, see *In re
Arens*, 41 *N. J.* 364, 384–87 (1964). We think the sound course
is to leave the question open so that the possible equities may be
weighed in a specific setting."

## II

Adoption laws were first enacted in the United States in
the second half of the 19th Century. Adoption having been
unknown to the common law, "issue" then necessarily con-
noted a blood relationship. So, too, did other words descrip-
tive of a filial connection, and for the same reason. Hence
one cannot draw upon cases which antedated an adoption
statute to decide whether, in the absence of evidence of the
testator's actual intent, the word "issue" should presump-
tively include only a natural child in the face of the
legislative finding implicit in an adoption statute that
people generally would want an adopted child to take.

The limited question we reserved in *Coe* is whether the
word "issue" had a biological flavor not found in other words
used to designate a filial relationship, and if so, whether
reliance thereon could create equities sufficient to require
us to attribute to "issue" a *prima facie* signification which
we believe to be erroneous, *i. e.*, that "issue" excludes an

---

[2] This statute (*N. J. S. A.* 9:3–30) is the 1953 adoption act
and reads in part:

"* * * In the construction of any testamentary or other docu-
ment executed subsequent to the effective date of this act, an adopted
child shall be deemed lawful issue of the adopting parent unless
such document shall otherwise provide."

adopted child. From our examination of the cases elsewhere and as well upon a review of the decisions in our State, we cannot suppose the draftsman of the will before us seized upon that word with an awareness of the problem and a purpose to exclude a child whom a child of the testator might later adopt.

It of course is not possible, within the limits of an opinion, to discuss all of the cases in this country. Nor is it necessary when the reason for the survey is to determine only whether a lawyer deliberately selected the unadorned word "issue" to state his client's insistence that only a natural child may take. Some broad brushes may be employed. Adoption laws, especially at the outset of this statutory development, varied, or were thought to vary, considerably with respect to the status or rights conferred upon the adopted child, and these statutory differences undoubtedly influenced the results reached in the cases. See Kales, "Rights of Adopted Children," 9 *Ill L. Rev.* 149 (1914) ; Oler, "Construction of Private Instruments Where Adopted Children Are Concerned," 43 *Mich. L. Rev.* 705 (1945). In this regard, we note that our original statute, which we will presently quote, provided in explicit terms that the relationship shall be "in all respects" the same "as if the child had been born to the adoptive parents in lawful wedlock," subject only to certain stated exceptions. Further a case holding that "issue" does not include an adopted child may reflect, not the special meaning of "issue," but rather an assumption that donors generally prefer the blood line, an assumption which would equally exclude the adopted child from all generic words of filial import. That assumption figures in the stranger-to-the-adoption concept which presumptively bars the adopted child, whatever the generic word used, except when the donor was the adoptive parent. That exception seems anomalous, for if donors harbor a preference for the blood line, one would expect it to be as compelling, or more so, when donors speak in terms of their own "issue." The anomaly may be only debatably so when the donor adopted

the child before executing the instrument, for it could be argued he would likely want to fulfill the parental obligation he had assumed by adoption, while on the other hand it could be urged that, being aware of the adoption, his use of a term of supposed biological import points to a conscious decision to exclude the adopted child. But when the adoption occurred years after the execution of the instrument, especially an irrevocable *inter vivos* trust, the anomaly seems evident, since it is difficult to suppose a donor intended "issue" to include a child he might adopt years later but to exclude a child adopted by a child of his own. At any rate, when an opinion involving the word "issue" reflects a judge's belief that people prefer the blood line, either generally or as to gifts to others, it cannot be assumed the decision turned upon the proposition that "issue" has a special biological flavor unless the opinion expressly differentiated that word from the other generic ones.

Our first adoption law was enacted in 1877 (*c.* 83) and the case is submitted on the premise that its terms control the present case. It is a strong statute, which, subject to limited exceptions, conferred upon the adopted child the status of a natural one. Its pertinent provisions appeared in *R. S.* 9:3–9 (since superseded by *N. J. S. A.* 9:3–30, enacted in 1953, *c.* 264, §14), in these terms:

"Upon the entry of a decree of adoption, * * * the child shall be invested with every legal right, privilege, obligation and relation in respect to education, maintenance and the rights of inheritance to real estate, or the distribution of personal estate, on the death of such adopting parent or parents, as if born to them in lawful wedlock; subject, however, to the limitations and restrictions hereinafter in this section set forth.

The adopted child shall not be capable of taking property expressly limited to the heirs of the body of the adopting parent or parents, nor property coming from the collateral kindred of such adopting parent or parents by right of representation.[3]

---

[3] These exceptions were dropped in the 1953 adoption act which provides, *N. J. S. A.* 9:3–30:

"B. The entry of a judgment of adoption shall establish the same relationships, rights, duties and obligations between the child

\*     \*     \*     \*     \*     \*     \*     \*

If the adopting parent or parents shall have other child or children, the children by birth and by adoption shall, respectively, inherit from and through each other, as if all had been children of the same parents born in lawful wedlock."

The sweep of the statute appears even more clearly in its provision, *R. S.* 9:3–7, that the decree of adoption shall adjudge:

"'\* \* \* that the rights, duties, privileges and relations between the child and his parent or parents by adoption shall thenceforth, in all respects, be the same, including the right of inheritance, as if the child had been born to such adopted parent or parents in lawful wedlock, except only as otherwise provided in this chapter."

It is interesting to note that under the same statute it was held both in Massachusetts and Rhode Island, long before 1935 when the will here involved was drawn, that "issue" included an adopted child. It was so held in *Sewall v. Roberts,* 115 *Mass.* 262 (*Sup. Jud. Ct.* 1874). That case involved an irrevocable *inter vivos* trust created in 1825. The funds were deemed to be those of Robert Roberts, the designated life beneficiary. In 1865 Robert Roberts adopted a child. The court held that the adopted child was "issue" of Robert Roberts under the indenture even though the trust was created 40 years before the adoption and the trust was irrevocable. With respect to the statutory provision that an adopted child may not take property "expressly limited to the heirs of the body or bodies of the parents by adoption," the Massachusetts court said (115 *Mass.,* at 276–277) :

and the adopting parent as if such child were born to such adopting parent in lawful wedlock. In applying the intestate laws of this State, an adopted child shall have the same rights of inheritance as if born to the adopting parent in lawful wedlock. In the construction of any testamentary or other document executed subsequent to the effective date of this act, an adopted child shall be deemed lawful issue of the adopting parent unless such document shall otherwise provide."

These exceptions in the 1877 act remain, however, in the statute dealing with the adoption of *adults. N. J. S.* 2A:22–3.

"The other exception is that she cannot take property 'expressly limited to the heirs of the body or bodies of the parents by adoption.' The term 'heir of the body' is a well established technical term, with which the words 'children' or 'issue' or 'lawful issue' are not synonymous. The rule of construction enjoined by our statutes is, that technical words or phrases which have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning, unless it is inconsistent with the manifest intent of the legislature or repugnant to the context. Gen. Sts. c. 3, § 7.

The language of the statute shows that the legislature intended to use the phrase 'heirs of the body or bodies' in its primary technical sense. The terms of the settlement, above cited, do not limit the estate expressly 'to the heirs of the body' of Roberts; and the terms therein used, 'child or children,' 'issue' and 'lawful issue,' are not equivalent terms, and do not lead to the same construction and legal result as would be reached if the estate was in direct words limited to the heirs of his body. We are therefore of opinion that the case does not fall within either of the exceptions of the statute, and that, as to the property in question, Ada Parker Roberts is to be deemed the child of Robert Roberts, the same as if she had been born to him in lawful wedlock. It follows that, in the contingency which has happened, she is as such child entitled to the whole of the principal fund."

The Rhode Island cases to which we refer are *Hartwell v. Tefft,* 19 *R. I.* 644, 35 *A.* 882, 34 *L. R. A.* 500 (*Sup. Ct.* 1896), and *In re Olney,* 27 *R. I.* 495, 63 *A.* 956 (*Sup. Ct.* 1906). The Rhode Island statute, as we have said, was the same as our 1877 act. In *Hartwell* the testator created a trust for his children and grandchildren, their respective portions to be paid upon their death "to their lawful issue," with gifts over if they died without issue. After testator's death his granddaughter adopted a child, and the question was whether the adopted child was her "lawful issue" under the testator's will. The court held for the adopted child, and in so doing, rejected the proposition that "issue" meant "heirs of the body" within the meaning of the exclusionary provision of the adoption statute. In *Olney,* the testator died in 1892. After testator's death his son adopted a child, and the question was whether the adopted child was "issue" of the son. Following *Hartwell,* the court held that "issue" did not mean "heirs of the body" within the exclusionary pro-

vision of the adoption law and that the adopted child was "issue" within the meaning of the will.

These cases were deemed to be correct expositions of such a statute by Professor Kales in an article he wrote in 1914. 9 *Ill. L. Rev., supra,* at 150, 164–165.

There was a shift in both Massachusetts and Rhode Island, although neither State embraced the view that "issue" connoted a biological relationship, *i. e.,* heirs of the body. In Massachusetts, following *Sewall v. Roberts,* the Legislature enacted a rule of construction that "child" or its equivalent shall include an adopted child in any instrument of the adoptive parents unless the contrary clearly appears by its terms, but that when the maker is not the adoptive parent the adoptive child shall not take unless it plainly appears that his inclusion was intended. See *Tirrell v. Bacon,* 3 *F.* 62 (*Cir. Ct. D. Mass.* 1880); Kales, *supra,* 9 *Ill. L. Rev.,* at 166. Thus the statute embraced the stranger-to-the-adoption concept, rather than the proposition that "issue" spells out a biological demand. Later, in 1958, the Massachusetts statute was amended to reinstate the view of *Sewall v. Roberts.* See *Moore v. Cannon,* 347 *Mass.* 594, 199 *N. E. 2d* 312, 314, *n.* 3 (*Sup. Jud. Ct.* 1964).

The Rhode Island cases had an odd history. In 1956 a statute was adopted providing that in the construction of an instrument, whether executed before or after that enactment, an adopted child shall be included within a limitation to "the lawful issue or descendants" of the parent by adoption unless a contrary intention shall appear. That statute restated in substance the view of *Hartwell* and *Olney,* and perhaps did so to overturn cases, about to be cited, which had departed from *Hartwell* and *Olney.* In 1962 the statute was amended to limit that statutory rule of construction to children adopted during the lifetime of the maker of the instrument. *Rhode Island Hospital Trust Co. v. Hooker, R. I.,* 219 *A. 2d* 772 (*Sup. Ct.* 1966), involved a will made in 1931 by a testator who died in 1933. The adoption occurred in 1953. As part of his argument, the adopted child

pressed *Hartwell* and *Olney* under which he would have prevailed. As to this, the court observed that *Hartwell* and *Olney* could not be reconciled with subsequent decisions which, strangely, had not mentioned them, and concluded that *Hartwell* and *Olney* should be overruled and the intervening cases reaffirmed. The intervening cases referred to were *Union Trust Co. v. Campi,* 51 *R. I.* 76, 151 *A.* 131 (*Sup. Ct.* 1930), and *Rhode Island Hospital Trust Co. v. Sack,* 79 *R. I.* 493, 90 *A. 2d* 436 (*Sup. Ct.* 1952), 91 *A. 2d* 676 (*Sup. Ct.* 1952). Both involved the word "children," rather than "issue," and hence are not revealing in our immediate inquiry, *i. e.,* whether "issue" has a special biological connotation. Nor, of course, did the 1962 Rhode Island statute distinguish between "issue" and the other generic terms.

Other jurisdictions have found that "issue" includes an adopted child. So in *Dollar Savings & Trust Co. of Youngstown v. Musto,* 88 *Ohio L. Absl.* 62, 181 *N. E. 2d* 734 (*Ct. App.* 1961), the court held that a child adopted by the son of the testatrix 16 years after her death (1938) and 17 years after her will was executed (1937) was the son's "issue" within the meaning of the will. The Ohio statute, like our own, provided that an adopted child "shall not be capable of inheriting property expressly limited to the heirs of the body of the adopting parent or parents." With respect to whether "issue" was synonymous with "heirs of the body," the court said (*p.* 735):

"At first blush, this would seem to be so, and we feel that the meaning of 'issue' in times gone by was probably just that. But in modern days, after reading all the cases submitted and after careful research, we find that the word 'issue' has taken on a much broader meaning and feel that it now, and did at the time the will was drawn, include adopted children. * * *"

See also *Cook v. Crabill,* 110 *Ohio App.* 45, 164 *N. E. 2d* 425 (*Ct. App.* 1959); but *cf. National City Bank of Cleveland v. Mitchell,* 234 *N. E. 2d* 916 (*Ct. App. Ohio* 1968).

In *In re Heard's Estate,* 49 *Cal.* 2d 514, 319 *P.* 2d 637 (*Sup. Ct.* 1957), the testatrix died in 1939, leaving a will executed in 1935. Her son adopted a child in 1950. The court held the adopted child was the son's "lawful issue" within the meaning of the will.

In *Re Estate of Cunha,* 49 *Hawaii* 273, 414 *P.* 2d 925 (*Sup. Ct.* 1966), the testator died in 1918, leaving a will executed in 1917. The will provided that "lawful issue" of the testator's daughter should take. It was held that children adopted by the daughter's son in 1948 were her "lawful issue." In part, the court relied upon ancient Hawaiian custom which had equated adopted and natural children, but it relied also upon the opinion of the California Supreme Court in the *Heard* case to which we have referred in the preceding paragraph.

In *Breckenridge v. Skillman's Trustee,* 330 *S. W.* 2d 726 (*Ct. App. Ky.* 1960), the testator died in 1946. His will executed in 1929 provided for the gift of a remainder to "issue" of his son. A child the son adopted after the testator's death was held to take by virtue of a provision of the adoption statute that an adopted child "shall be considered for purposes of inheritance and succession and for all other legal considerations, the natural, legitimate child of the parents adopting it the same as if born of their bodies."

In *Re Holden's Trust,* 207 *Minn.* 211, 291 *N. W.* 104 (*Sup. Ct.* 1940), the testatrix died in 1926, one year after making her will. She provided for her own adopted son for his life. The question was whether a child adopted by her adopted son 11 years after her death was "lawful issue" of her adopted son. The Minnesota court, upon an exhaustive review of the decisions in this country, held the adopted child was such lawful issue. The court deemed the Minnesota statute to be the equivalent of the Massachusetts statute involved in *Sewall v. Roberts, supra,* 115 *Mass.* 262, and agreed with the thesis of that case and as well with *Hartwell v. Tefft, supra,* 19 *R. I.* 644, 35 *A.* 882.

In *Kindred v. Anderson,* 357 *Mo.* 564, 209 *S. W.* 2d 912 (*Sup. Ct.* 1948), the court held that "issue" did not "ex-

pressly" mean "heirs of the body" within the exclusionary clause of the adoption statute. But *cf. Ratermann v. Ratermann,* 405 *S. W. 2d* 891 (*Sup. Ct. Mo.* 1966).

Of special interest are some cases in New York, to which we shall refer again, because the will before us was drawn by a member of the New York bar. *Matter of Park,* 15 *N. Y. 2d* 413, 260 *N. Y. S. 2d* 169, 207 *N. E. 2d* 859 (*Ct. App.* 1965), involved the will of a man who died in 1909. His will created trusts for each of his children, income for the life of the child, the *corpus* on the child's death to be distributed "among his issue him or her surviving in equal shares." One child, Mary, died in 1961. Her son had predeceased her, but she was survived by his two children, one of whom was an adopted child. The question was whether the adopted child shared with the natural child as "lawful issue" of the testator's daughter. The court held the adopted child was such "issue" under an adoption law which provided that an adopted child "shall have all the rights" "of the relation" of "parent and child." In discussing earlier New York cases in which the adopted child did not prevail, the court stressed that they turned upon another statutory provision which provided that an adoption could not operate to cut off a remainder which would follow if there were no issue. The court held the statute relating to the cutting-off of a remainder did not apply because the existence of a natural child itself precluded the gift over, and hence the adopted child, being "issue," shared in the gift with the natural child. We note, parenthetically, that this is the factual pattern before us and hence, had the will here been that of a New York testator, the adopted child would have shared with the natural son as "issue" of the testator's daughter.

The *Park* case was decided by a vote of 4 to 3.[4] Recently the New York Court of Appeals held unanimously that

[4] The dissent in *Park* contended that New York had theretofore embraced the stranger-to-the-adoption concept, and to support that statement the dissent cited *In re Leask,* 197 *N. Y.* 193, 90 *N. E.* 652,

children adopted by a son of the testatrix in 1956, five years after her death, were entitled to take, reaffirming the principle of *Park* that the presumption exists in favor of an adopted child "whether the word 'heir,' 'child,' 'issue' or other generic term expressing the parent-child relationship is used." *Matter of Silberman*, 23 *N. Y.* 2d 98, 295 *N. Y. S.* 2d 478, 242 *N. E.* 2d 736 (1968).

We refer also to *Johns v. Cobb*, 402 *F.* 2d 636 (*D. C. Cir.* 1968), petition for *certiorari* filed, 37 *U. S. L. W.* 3263 (1969). The adopted child claimed under two wills as "issue" of his adoptive mother. One will was executed in 1922, two years before the adoption, by the adoptive mother's grandmother. The other was executed in 1944 by his adoptive mother's aunt. The court found no aid in the wills or extrinsic circumstances. Observing that the word "issue" has no established meaning with respect to the problem of adoption and hence that no competent draftsman would have relied upon it alone to exclude an adopted child, the court, following the general policy of the 1963 adoption statute of the District of Columbia and "the unmistakable trend of judicial decisions in other jurisdictions," held that "absent any contrary indication of the testators' actual intent, appellant [the adopted child] should be deemed to be included within the terms of the testamentary gifts to 'issue' in the wills now before us." (402 *F.* 2d, at 638).

On the other hand, as we noted in *Coe*, there are authorities which say some cases find a special biological connotation in the word "issue." We there referred to 3 *Powell, Real Property* ¶ 360, *p.* 152 (1952), and Oler, "Construction

27 *L. R. A., N. S.*, 1158 (*Ct. App.* 1910), in which an adopted child was found not to be a "child" under the will of a stranger to the adoption. We note that in *Leask* (90 *N. E.* at 654) the court thought the statutes in Massachusetts and Rhode Island were broader and more comprehensive than New York's and on that basis distinguished *Sewall v. Roberts, supra,* and *Hartwell v. Tefft, supra.* As we have said, the statutes of Massachusetts and Rhode Island at the time of those decisions were like the New Jersey statute here involved.

of Private Instruments Where Adopted Children Are Concerned," *supra,* 43 *Mich. L. Rev.* 705, 727–734 (1945). We may add the annotation in 86 *A. L. R. 2d* 12, 69 (1962). But an examination of the cases they cite reveals that there are not many cases which turn wholly upon the proposition that "issue," unlike other generic terms, imports a biological relation. Cases which so hold and apparently remain the law of their respective States are *Miller v. Wick,* 311 *Ill.* 269, 142 *N. E.* 490, 30 *A. L. R.* 1407 (*Sup. Ct.* 1924); *Poertner v. Burkdoll,* 201 *Kan.* 41, 439 *P. 2d* 393 (*Sup. Ct.* 1968); *Everett v. Dockery,* 203 *Miss.* 125, 33 *So. 2d* 313 (*Sup. Ct.* 1948); *Holter v. First National Bank & Trust Co. of Helena,* 135 *Mont.* 27, 336 *P. 2d* 701 (*Sup. Ct.* 1959); *Bradford v. Johnson,* 237 *N. C.* 572, 75 *S. E. 2d* 632 (*Sup. Ct.* 1953); *In re Howlett's Estate,* 366 *Pa.* 293, 77 *A. 2d* 390 (*Sup. Ct.* 1951); *In re Trust of Pennington,* 421 *Pa.* 334, 219 *A. 2d* 353 (1966); *In re Uhlein's Estate,* 269 *Wis.* 170, 68 *N. W. 2d* 816 (*Sup. Ct.* 1955); see *Trowbridge v. Trowbridge,* 127 *Conn.* 469, 17 *A. 2d* 517 (*Sup. Ct.* 1941).

This survey reinforces our conviction in *Coe* that "The cases at most attributed but *prima facie* meaning to such words, and a competent draftsman would not deliberately pick a word which instead of controlling the context is easily colored by it." 42 *N. J.,* at 494. Indeed, back in 1914, Professor Kales made the same observation, 9 *Ill. L. Rev., supra,* at 159–160:

"The case which presents peculiar difficulties is where there is no special context and no surrounding circumstances exist which warrant the inference that the testator or settlor had a real and actual intention concerning the inclusion or exclusion of the adopted child. The typical case of this sort is where the 'heirs,' 'children' or 'issue' referred to are to be ascertained at a distant future time, frequently after the testator's death, and there has been no adoption of any child who could claim to be within the class and no act of adoption has been thought of or considered at the time of the execution of the will, settlement, or insurance policy. In this class of cases the only legitimate inference from the context and surrounding circumstances is that the testator or settlor has no actual in-

tention whatever in respect to the difficulty which afterwards arises by the appearance of an adopted child. The very fact that the difficulty has arisen is often the clearest proof that the testator or settlor never thought of the matter at all, for if he had, it is hardly possible that he would not have expressed his desires in the clearest terms."

## III

From the foregoing, it is not reasonable to assume that a lawyer conversant with the general state of the law would have relied upon "issue" to exclude an adopted child. Nor, as of 1935 when the will in question was drawn, would anyone have so relied upon that word on the basis of the decisions in our State.

*Wright v. Gaskill,* 74 *N. J. Eq.* 742 (*Ch.* 1908), passed upon a will which devised real property to a nephew and niece for their lives "and after their death to their lawful issue, in fee simple absolute." Of interest is a parenthetic statement in the opinion that "their issue" means "heirs of the body" (*p.* 744). The case, however, did not involve an adopted child. Rather the question was whether the children of the nephew and niece took *per stirpes* or *per capita*. The testator died in 1856, and the court gave to "issue" the meaning it of course had at common law. The case has not figured in the decisions involving the adoption act. Nor could it shed light upon the question whether, under a statute which confers upon an adopted child the status of one born to the adoptive parents in lawful wedlock, the word "issue" would "expressly" signify "heirs of the body" within the phrase "expressly limited to the heirs of the body of the adopting parent or parents." It is the adoption statute itself which generated the dispute as to the meaning of "issue," and that dispute must be resolved in the context of that statute. The objective of the statute would be defeated if it were read to mean that every word which at common law signified children of the blood should continue to signify "heirs of the body" and to do so "expressly."

The first relevant case which would have engaged a researcher in 1935 is *In re Book*, 90 *N. J. Eq.* 549 (*E. & A.* 1919). There the court held that "issue," as well as "child" or "children," when used in other statutes, included an adopted child (*p.* 553). Although the statute there involved the relation between an adopted child and the adoptive parent, the court nowhere suggested that "issue" would have another meaning under a statute which bore upon a will drawn by a stranger to the adoption. See *Smallwood v. Smallwood*, 121 *N. J. Eq.* 126 (*Ch.* 1936). *In re Alter*, 92 *N. J. Eq.* 415 (*Prerog.* 1921), involved the same question presented in *Book* and of course it followed that case.

The next relevant case is *Haver v. Herder*, 96 *N. J. Eq.* 554 (*Ch.* 1924). The Vice Chancellor held that "heirs," "lawful heirs" and "legal heirs" of the testator's son included a child the son adopted. The court expressly flagged the question whether "issue" might "perhaps" demand a different result, saying parenthetically (*p.* 558):

"(I have not included the word 'issue,' because that might, perhaps, fairly be taken to mean 'heirs of the body,' under the express exception provided by the statute, to wit, that an adopted child shall not be capable of taking property expressly limited to the heirs of the body of the adopting parent or parents.)"

*Ahlemeyer v. Miller*, 102 *N. J. L.* 54 (*Sup. Ct.* 1925), affirmed, 103 *N. J. L.* 617 (*E. & A.* 1927), involved a deed. The case held that an adopted child would not take as the "child" of the life tenant, but the court said the construction of a will would be another matter (*p.* 57):

"The legal construction accorded to a covenant in a deed of conveyance has always differed from the liberality of view accorded by courts of equity to the same terms in a will, the reason being that the sole purpose of testamentary construction is to invoke the intention of the testator, while the language of the grantor employed in a common law deed of conveyance has, by centuries of judicial construction and interpretation, been settled, until in this day the difference has become axiomatic."

The last significant case decided before the execution of the will before us is *Dulfon v. Keasbey,* 111 *N. J. Eq.* 223 (*Ch.* 1932). The gift was to the "lawful issue" of the testator's son. The son adopted a child one year after the testator died. The Vice Chancellor found the testator did not intend to benefit the adopted child. It is this case which counsel for the natural child before us insists would have led the draftsman to take it to be settled that a child the testator's daughter might later adopt would not be her "issue."

The opinion in that case is not easy to follow. The Vice Chancellor did not turn his decision upon the thesis that the word "issue" would exclude an adopted child where the actual intent is unknown. Indeed he went to great lengths to demonstrate that the will itself revealed an intent to channel the testator's beneficence within the blood line. It is true that in the course of his factual discussion he added that, "Then there is always a presumption of a testamentary leaning towards kinship" (*p.* 229), but he did not say that "leaning" would withstand the pull of the adoption law. On the contrary, the Vice Chancellor seemingly said that, absent evidence of the testator's actual intent, the adoption statute would supply an intent to include the adopted child. He said (*p.* 227) :

"The medium of the inheritance may be a will. Where the testamentary intention is indefinite or obscure an adopted child may take under it if his status answers the description of the will. The statutory system supplies the intention; he takes by designation of the system. That was the situation in *Haver v. Herder,* 96 *N. J. Eq.* 554."

He continued (*p.* 227) :

"The cases cited by the guardian *ad litem* of the adopted child are based on legislative intendment read into the will. *Hartwell v. Tefft,* 19 *R. I.* 644, 35 *A.* 882, 34 *L. R. A.* 500 ; *Clark v. Clark,* 76 *N. H.* 551, 85 *A.* 758 ; *Batchelder v. Walworth,* 85 *Vt.* 322, 82 *A.* 7, 37 *L. R. A.* (*N. S.*) 849 ; *Mooney v. Tolles,* 111 *Conn.* 1, 149 *A.* 515, 70 *A. L. R.* 608, *Ansonia Nat. Bank v. Kunkel,* 105 *Conn.* 744,

136 *A.* 588, turned upon the ascertainment of testamentary intention from the will and the associated circumstances. Here there is no room for the legislative scheme; the testator had his own, and it is unmistakable."

and closed his opinion with these words (*p.* 230):

"There is no conflict between *Ahlemeyer v. Miller* and *Haver v. Herder.* One treats of presumptions that guide in the search for testamentary intention; the other, of the presumed concurrence by the testator in the legislative intent where he expresses no other."

It should be noted that in the second excerpt we have quoted, the Vice Chancellor referred to the Rhode Island case of *Hartwell v. Tefft.* As we pointed out earlier, that case held under a statute like ours that a testamentary gift to "issue" of the testator's son was taken by a child adopted by the son after the testator's death. The Vice Chancellor seems to have accepted that view as sound when the will itself or the surrounding circumstances do not reveal an intent to exclude the adopted child. He certainly did not reject that decision.

We think no one could have read *Dulfon* to mean that "issue" presumptively excluded an adopted child, or, more to the immediate point, no one would have been led by that opinion to rely upon that naked word to spell out an intent to bar such a child. Without charging the draftsman with anticipating *In re McEwan's Estate,* 128 *N. J. Eq.* 140 (*Prerog.* 1940), we point out that the Vice Ordinary in *McEwan* read *Dulfon* the other way, saying (*p.* 145):

"This case [*Haver v. Herder*] was apparently accepted by Vice-Chancellor Backes in *Dulfon v. Keasbey, supra:*
　'Where the testamentary intention is indefinite or obscure, an adopted child may take under it if his status answers the description of the will. The statutory system supplies the intention; he takes by designation of the system. That was the situation in *Haver v. Herder.'*
Undoubtedly the decision in *Haver v. Herder* would have been the same if testator had used the word 'children' instead of 'heirs,' or if he had written 'issue,' except for the doubt arising from the proviso in the Adoption act. I have concluded that the proviso does

not justify excluding adopted children from a class described as 'issue.' "

The proviso to which the last sentence referred was the statutory exception that:

"The adopted child shall not be capable of taking property expressly limited to the heirs of the body of the adopting parent or parents."

The Vice Ordinary then explained why he believed "issue" would not invoke that exclusionary provision, expressly agreeing with *Sewall v. Roberts,* the Massachusetts case we discussed earlier, which had so held (*p.* 146).

This review of our cases buttresses the finding of fact we have already made that the New York attorney who prepared the will did not discuss the subject with the testator and did not consider the meaning of "issue" in New Jersey until confronted with the widow's specific inquiry in 1946, after which he sought the views of a New Jersey lawyer in connection with the first intermediate account. Cases decided in our State after the testator's death did support the view that "issue" means "heirs of the body," but it would be fictional indeed to impute such prescience to the draftsman. If one were to speculate in that regard, it would be more realistic to impute to him knowledge or anticipation of the law of the State in which he practiced and to suppose that he used his words in that light. Upon that basis we would have to say that the draftsman knew that under New York law a natural child would share the gift to "issue" of his mother with a child his mother might adopt. That, as we have already pointed out, was the holding of the New York Court of Appeals in *Matter of Park, supra,* and *Matter of Silberman, supra.*[5] Thus, if the will before us were

---

[5] A New York lawyer, upon a reading of a New York case decided in 1910, could well have concluded that the New York Courts would read the New Jersey statute, absent a definitive New Jersey decision, to lead to the inclusion of the adopted child. See *fn. 4, supra.*

governed by the law of the State of the attorney who drew it, the adopted child would prevail. It would be odd, indeed, to assume that a New York lawyer who did not research the law of New Jersey would have anticipated precisely the opposite result. We intend no criticism of the draftsman. Indeed we would be unkind if we found as a fact that he consciously relied upon "issue" to spell out his client's wish to exclude an adopted child. The subject simply was not in mind. That being so, we should accept the intent the adoption statute would supply.

## IV

We come then to the final aspect of the case, whether equities arose after the testator's death by reason of reliance upon subsequent decisions attributing to "issue" a *prima facie* meaning of "heirs of the body" within the exclusion in the adoption statute. This view of "issue" was stated in *In re Fisler,* 133 *N. J. Eq.* 421, 423 (*E. & A.* 1943), where it was held that a child adopted by testatrix' grandniece 23 years after the death of the testatrix was not "lawful issue" of the adoptive mother within the meaning of the will in the absence of evidence that the testatrix intended to include an adopted child. New Jersey counsel for the trustees and counsel for the father of the adopted child relied upon that case in giving their opinions in 1948 and 1950, respectively, that the adopted child could not take. That conclusion was reaffirmed by *In re Wehrhane,* 23 *N. J.* 205 (1957), where, however, the majority opinion departed from the theme of *Fisler* that "issue" meant "heirs of the body" and instead placed its result upon the stranger-to-the-adoption thesis, which thesis, of course, does not depend upon whether the word is "issue" or "child" or something else. The concept of *Wehrhane* thus differed from the concept of *Fisler,* and the difference could in given circumstances lead to contrary results.[6] In any event, it is fair to assume that had the

---

6 Such a case arose in New York. It involved an irrevocable trust created by a New Jersey resident and governed by New Jersey law.

present controversy been adjudged at any time between *Fisler* and *Wehrhane,* the adopted child would have lost.

But the controversy was not then adjudged, and the question is whether we are constrained to apply *Fisler* or *Wehrhane* despite our belief that they erred in their approach to testamentary intent. Counsel for the natural child asserts his rights to the future income and to the remainder "vested" in 1937 when the testator died and thereupon became constitutionally secured from change. The premise of course is that a trial court opinion, *Dulfon v. Keasbey,* thus settled the respective rights of that child and his adopted brother. We have already stated why we believe no one could then have been confident of such a reading of that decision or of its acceptance as the law of this State. In any event, neither the State nor the Federal Constitutions bar retrospective application of judicial decisions disagreeing with prior cases.

Retrospective application is the usual course with respect to case law, and although the power to limit a ju-

---

The settlor was 24 years of age and single when he created the trust in 1935. The indenture provided for the settlor's wife, if he should have one, and for "his surviving issue." In 1939 the settlor married a woman who had four children by a prior marriage, ages 15, 17, 18 and 19. No children were born to the settlor. In 1952, at age 41, having failed in his efforts to break the trust, the settlor adopted his step-children, who were then 28, 30, 31 and 32. He died in 1961. The New York Appellate Division, following the doctrine of *Fisler* that "issue" means "of the body," held the adopted children did not take. *In re Nicol's Trust,* 24 A. D. 2d 191, 264 N. Y. S. 2d 787 (*1st Dept.* 1965). There being no evidence that at the time of the execution of the trust the settlor anticipated the adoptions 17 years later and intended to include children so acquired, the Appellate Division was faithful to *Fisler.* But the Court of Appeals reversed by going to *Wehrhane,* and deducing from the stranger-to-the-adoption thesis of that case that there is "a presumption that the settlor of the trust intended to include his adoped children in the term issue." 19 N. Y. 2d 207, 278 N. Y. S. 2d 830, 225 N. E. 2d 530 (*Ct. App.* 1967). We of course agree with the ultimate result, and note that it is the same result reached in *Sewall v. Roberts,* the early Massachusetts case we have already discussed.

dicial decision to prospective application is now clear, there is no constitutional command to do so. Thus, even a judgment, correct when entered, will fall on direct appeal if the appellate court disagrees with the prior decisions. The nature of the judicial process requires the power to revise, to limit, to overrule, if justice is to be done. *Cohen v. Kaminetsky*, 36 *N. J.* 276, 281–282 (1961). So also does necessity. Rules of law are constantly evolving or changing. The judicial process would be seriously burdened if the rights of litigants in the vast area covered by case law had to be determined upon the basis of what the highest court of the State would likely have held at some earlier date.

In the last analysis, it is the intent of the testator which here controls, and the controversy relates only to a canon of construction bearing upon the search for his probable wish. We see no reason why *Fisler* must be overruled prospectively only. See *In re Arens*, 41 *N. J.* 364 (1964); *Brinkerhoff-Faris Trust & Savings Co. v. Hill*, 281 *U. S.* 673, 680–681, 50 *S. Ct.* 451, 74 *L. Ed.* 1107, 1113–1114 (1930); *Stockholders of Peoples Banking Co. of Smithsburg v. Sterling*, 300 *U. S.* 175, 182–183, 57 *S. Ct.* 386, 81 *L. Ed.* 586, 591 (1937). We find nothing to the contrary in *Demorest v. City Bank Farmers Trust Co.*, 321 *U. S.* 36, 64 *S. Ct.* 384, 88 *L. Ed.* 526 (1944), which dealt with retrospective application of a statute.

Hence the question remains, as we stated it in *Coe*, whether because of reliance upon *Fisler* there are equities which override the justice of the adopted son's cause. We find none. As we have said, the adopted child properly does not assert a right to have the natural child account for moneys already received, or to surcharge the trustees for payments made. His claim is limited to what is undistributed. The testimony of the natural child reveals essentially the following. In 1964 he executed an irrevocable trust covering the first million dollars of the principal sum involved in this litigation, and in 1966 he created a further

trust for the balance, revocable at once as to one-half and after ten years as to the remainder. The settlor himself is the life beneficiary of these trusts, and as to so much as is irrevocable or not presently revocable, he reserved the power to control the disposition of the *corpus,* at least by will. The natural child also testified that he refrained from challenging his own father's will in the belief that he would take all of his mother's share under the will before us. Perhaps too he urges that he established a style of living upon that expectation. None of these circumstances can warrant denying the adopted child his portion of the principal here involved, estimated at $3,250,000, and the retained income.

We therefore conclude that the adopted child shares equally with the natural child in the *corpus* and in the retained income. The judgment is reversed and the matter remanded to the trial court for the entry of judgment in accordance with this opinion.[7]

HALL, J. (dissenting). I see no significant difference for present purposes between "children", "heirs", "issue", "descendants" or other such generic terminology, when used in the will of a stranger to the adoption. There being no substantial evidence that the matter of adopted issue was ever considered by the testator or of any contrary probable intent on his part, the primary presumption of exclusion should control. The judgment should therefore be affirmed for the reasons expressed in my dissenting opinion in *In re Coe,* 42 *N. J.* 485, 495 (1964). To the authorities there referred

---

[7] The dissenting opinion of Mr. Justice Jacobs would remand the matter for further testimony upon the testator's actual intent. There has been no suggestion that any relevant evidence exists. As to the practice of the law firm, we have already had complete disclosure. The file nowhere reveals that either adoption or the meaning of "issue" was mentioned. As to the senior draftsman's alleged personal preference for blood line, we do not understand how his feelings on adoption (if indeed he had any) can possibly be imputed to his client. As to the testator's widow, there is no suggestion she ever discussed the subject with the testator. As to

to may be added *Oler, Construction of Private Instruments Where Adopted Children Are Concerned,* II, 43 *Mich. L. Rev.* 901, 933 (1945) where, in a comprehensive review of the differing law in all jurisdictions, New Jersey is listed with those states adhering to the stranger-to-the-adoption thesis, citing cases beginning with *Ahlemeyer v. Miller,* 102 *N. J. L.* 54 (*Sup. Ct.* 1925), affirmed 103 *N. J. L.* 617 (*E. & A.* 1927). See also a very recent decision of the Supreme Court of Connecticut in *Connecticut Bank and Trust Company, Trustee v. Hills, Conn.* (January 1969).

JACOBS, J. My vote is to remand for the taking of testimony as to the testator's probable intent with respect to the adopted child. A man may, within broad outer limits, dispose of his property in any manner he sees fit. The court's sole function is to carry out his wishes so far as it can reasonably ascertain them from his will and the surrounding circumstances, without regard to its own private preferences or to the acknowledged preferences of current society. In recent years we have opened the door wide for the introduction of testimony bearing on the testator's intent. See *Fidelity Union Trust Co. v. Robert,* 36 *N. J.* 561 (1962); *In re Cook,* 44 *N. J.* 1 (1965). Despite this, the lower court here apparently undertook to construe the will on its face without more; and although the New York law firm which prepared the will has submitted various memoranda to this Court, the avenues of further inquiry which they suggest have not been explored. I would do that now through oral

---

her own feelings with respect to adoption, which we deem not to be at all probative, the letter from counsel to her referred to in footnote 1, *supra,* reveals that she wanted her adopted grandchild, Roger Boone, to take with his natural brother under her will and hence counsel prepared a provision to that effect. The law firm's file shows that in her will executed in 1963 in which both the natural grandchild and the adopted grandchild were specifically mentioned, she provided that "issue" shall not include adopted children. We see nothing to be gained by exploring her sentiments, or the reason for a change, if any.

testimony before the trial court; that testimony would include detailed evidence with respect to the law firm's files and practices during the nineteen thirties when the testator's will was being drawn and executed; evidence with respect to the participation by the testator's widow Geraldine L. Thompson in the preparation of the will and her later discussions with her daughter Elisabeth who is still available for the giving of testimony; and such other evidence as might shed any light not only on the question of whether matters of adoption were discussed by the testator and his widow with members of the law firm but also on the broader question of what the testator "would have done had he 'envisioned the present inquiry.'" *Fidelity Union Trust Co. v. Robert, supra,* 36 *N. J.,* at 566.

As to the judicial presumption in 1935 with respect to the meaning to be given to the word "issue" in the absence of other evidence as to the testator's intent, I find no reason to depart from the views expressed in my brief concurrence to *Wehrhane.* 23 *N. J.,* at 211–212. It must be borne in mind that in the thirties the approach to adoptions was not quite what it is today. *Wehrhane,* 23 *N. J.,* at 210–211. In the memoranda furnished by the New York law firm, reference is made to the fact that Bronson Winthrop, the then head of the firm and the member who prepared the will with the assistance of an associate Walter Pfeiffer, both now deceased, had a strong personal feeling that "property should follow the blood line", and whenever the question arose "he presented that view to his clients". Vice Chancellor Backes who wrote the 1932 opinion in *Dulfon v. Keasbey,* 111 *N. J. Eq.* 223, holding the testator's will leaving his property to the issue of his son did not include a child later adopted by the son, considered adoption to be exceptional and laid stress on what he referred to as the "presumption of a testamentary leaning towards kinship." 111 *N. J. Eq.,* at 229. When the Vice Chancellor wrote, he was expressing views which were then widely held not only in New Jersey and New York but also in most of the other states and in the various treatises

which dealt with the subject of wills. See *In re Cotheal's Estate,* 121 *Misc.* 665, 202 *N. Y. S.* 268, 269 (*Sur. Ct.* 1923); *In re Gurlitz' Will,* 134 *Misc.* 160, 235 *N. Y. S.* 705, 709 (*Sur. Ct.* 1929); *In re Conant's Estate,* 144 *Misc.* 743, 259 *N. Y. S.* 885 (*Sur. Ct.* 1932); *Middletown Trust Co. v. Gaffey,* 96 *Conn.* 61, 112 *A.* 689, 691 (1921); *Miller v. Wick,* 311 *Ill.* 269, 142 *N. E.* 490 (1924); *Page, Wills* § 903, at 1510 (1926); *Rood, Wills* § 445, at 391 (1926); *Thompson, Construction and Interpretation of Wills* § 186, at 321 (1928). The opinion in *Ahlemeyer v. Miller,* 102 *N. J. L.* 54 (*Sup. Ct.* 1925), affirmed by the Court of Errors and Appeals in 1927 (103 *N. J. L.* 617) and relied upon heavily by the Vice Chancellor in *Dulfon,* took the view that while it was reasonable to presume that an adopted child was "within the intended bounty" of his adoptive parent, there was no comparable presumption where the testator was someone other than the adoptive parent. 102 *N. J. L.* at 58–59; *see Kocher, New Jersey Probate Law* 805–806 (1916); see also *Clapp, Wills and Administration in New Jersey* § 66, at 124 (1937); *cf.* 3 *Powell, Real Property,* par. 360, pp. 150–153 (1967). And the opinion of the Surrogate's Court in *Re Gurlitz, supra,* written in 1929, noted that "issue" was a legal term which was not common in ordinary conversation and that "its use is persuasive of the thought that the aim of testatrix was to limit her bounty to those in whose veins the same blood as her own coursed." 235 *N. Y. S.,* at 709.

In *Fisler,* decided in 1942, the Prerogative Court denied the claim of a later adopted child under the will of a stranger to the adoption; in the course of its opinion it described as "established law in this state", the judicial presumption that, in the absence of evidence of a contrary purpose, such adopted child would not come within the will's reference to "lawful issue". 131 *N. J. Eq.,* at 329. In his affirming opinion for the Court of Errors and Appeals, Justice Heher, after noting that the word "issue" signifies, *prima facie,* heirs of the body, pointed out that the question was essentially one

of intent and that there was nothing to indicate that the testatrix intended to include "those not of the blood among the objects of her bounty". 133 *N. J. Eq.*, at 423.

In 1953 the New Jersey Legislature directed that in the construction of any testamentary or other document (executed on or after January 1, 1954) "an adopted child shall be deemed lawful issue of the adopting parent unless such document shall otherwise provide." *N. J. S. A.* 9 :3–30. By its very terms the legislation had no bearing on earlier wills. *Wehrhane* (23 *N. J.* 205) held that in the construction of such earlier wills, the judicial presumption, upon which there presumably had been considerable reliance *(cf. Fidelity Union Trust Co. v. Potter*, 8 *N. J. Super.* 533, 539 *(Ch. Div.* 1950)) in the execution of wills and in the administration of estates, would continue. Comparable decisions elsewhere may readily be cited; the most recent is *Connecticut Bank and Trust Company, Trustee v. Hills, Conn.* (December Term, 1968) where the Connecticut Supreme Court dealt with an instrument executed in 1949 and containing a provision for payment of income to "descendants" of designated cousins. The court held that an adopted child of one of the cousins would not, in the absence of evidence of a contrary purpose, qualify as a descendant within the meaning of the instrument; it noted that the words "descendant" and "issue" in their ordinary and primary meaning "connote lineal relationship by blood" and would be so construed unless it clearly appeared that they were used "in a more extended sense"; in a footnote it pointed out that the Connecticut "General Statutes § 45–65a, first enacted in 1959, and applicable to wills and trust instruments executed subsequent to October 1, 1959, reverses this common-law presumption, but of course it is inapplicable to the trust involved in the present appeal." See *In re Estate of Graham*, 379 *Mich.* 224, 150 *N. W. 2d* 816 (1967) ; *In re Ashhurst's Estate*, 133 *Pa. Super.* 526, 3 *A. 2d* 218 (1938) ; *cf. Rattermann v. Rattermann*, 405 *S. W. 2d* 891 *(Mo.* 1966) ; *Wilson v. Ingram*, 207 *Ga.* 271, 61 *S. E. 2d* 126 (1950) ; *Powell, supra*, at 153.

*For reversal* — Chief Justice WEINTRAUB and Justices FRANCIS, SCHETTINO and HANEMAN — 4.

*For affirmance* — Justice HALL — 1.

*For remandment* — Justice JACOBS — 1.