IN THE MATTER OF THE ESTATE OF CHARLOTTE A. COE, DECEASED.

Argued April 6, 1964—Decided June 22, 1964.

486

*Mr. James E. Quinn* argued the cause for appellants (*Messrs. Morris, Downing & Sherred,* attorneys).

*Mr. Thomas J. Bitar* argued the cause for respondents Downs (*Messrs. Jeffers & Mountain,* attorneys).

*Mr. Thomas V. Jardine* argued the cause for respondents Guthrie, Flanagan and Plum (*Messrs. Carey & Jardine,* attorneys).

*Mr. Arthur J. Martin, Jr.* argued the cause for respondents Plum, Stout and Schneider (*Mr. Frank W. Hoak,* of counsel and on the brief).

The opinion of the court was delivered by

WEINTRAUB, C. J. The testatrix executed her will in 1897 and died in that year. In the will she provided for Theodora Margery Coe, "who has been living with me nearly all her life and has been maintained and educated by me and has become as a daughter to me, for whom I feel the affection of

a mother to a daughter." Theodora was an infant when she came to the decedent and was ten years old at decedent's death. Decedent never formally adopted Theodora. Theodora married, had no natural children, but did adopt two daughters. The question is whether they take a bequest to "lawful children" of Theodora. The trial court held the adopted daughters of Theodora were not her "lawful children" upon the authority of *In re Wehrhane*, 23 *N. J.* 205 (1957). *In re Estate of Coe*, 77 *N. J. Super.* 181 (*Ch. Div.* 1962). We certified their appeal before the Appellate Division acted upon it.

Our first adoption law was enacted in 1877 (*c.* 83). Its pertinent provisions appeared in *R. S.* 9:3–9 (since superseded by *N. J. S. A.* 9:3–30, enacted in 1953, *c.* 264, § 14), in these terms:

"Upon the entry of a decree of adoption * * * the child shall be invested with every legal right, privilege, obligation and relation in respect to education, maintenance and the rights of inheritance to real estate, or the distribution of personal estate, on the death of such adopting parent or parents, as if born to them in lawful wedlock; subject, however, to the limitations and restrictions hereinafter in this section set forth.

The adopted child shall not be capable of taking property expressly limited to the heirs of the body of the adopting parent or parents, nor property coming from the collateral kindred of such adopting parent or parents by right of representation.

\* \* \* \* \* \* \* \*

If the adopting parent or parents shall have other child or children, the children by birth and by adoption shall, respectively, inherit from and through each other, as if all had been children of the same parents born in lawful wedlock."

In *Wehrhane* the testatrix provided for a gift over upon her daughter's death "to the issue of my * * * daughter per stirpes." A bare majority of the court held that the adopted son of the daughter could not take. One member concurred on other grounds, and another dissented. The majority said in part (23 *N. J.*, at *p.* 208):

"All parties are in accord respecting the decisional law of our State that a provision for a 'child,' 'children' or 'issue' of another is presumed not to include an adopted child or children. See, *e. g., In*

re *Fisler*, 131 *N. J. Eq.* 310 (*Prerog.* 1942), affirmed 133 *N. J. Eq.* 421 (*E. & A.* 1943); *Fidelity Union Trust Co. v. Potter*, 8 *N. J. Super.* 533 (*Ch. Div.* 1950). The rule has general acceptance. 5 *American Law of Property* (1952), *secs.* 22.34, 22.36. The same authorities invariably recognize that the presumption may be sufficiently contradicted in the total context of the instrument or the circumstances surrounding and existent at its execution or the death of the testator."

The reference to "child" and "children" was *dictum* since the will spoke of "issue * * * *per stirpes*," but nonetheless as a trial court the court below in the present case quite properly felt it should abide by the quoted statement.

## I.

The pertinent decisions in this State are reviewed at length in the majority and dissenting opinions in *Wehrhane* and we see no benefit in repeating the discussions in detail. It will suffice to speak in terms of the broad concepts involved.

The majority opinion viewed the quoted provision of the adoption law to establish a rule of inheritance as between the adopting parent and the adopted child, and not "a rule of testamentary construction" (23 *N. J.*, at *p.* 209). It held the statute cannot control and indeed is not relevant in the interpretation of a will except, we assume, where the testator is the adopting parent, in which event words such as "issue" would be found to include the adopted child in light of the relationship created by the adoption act. But as to instruments executed by "strangers to the adoption," meaning anyone other than the adopting parent, the majority held such words mean only descendants of the blood unless it appears from the instrument or attendant circumstances that adopted children were intended to be included.

As the majority opinion in *Wehrhane* points out, its result prevails in a majority of the states. Litigation has been prolific, see Annotations, 86 *A. L. R.* 2d 12 (1962) and 86 *A. L. R.* 2d 115 (1962), and perhaps the very volume suggests the prevailing rule runs so against the common grain

that adopted children will not abide by it until a court holds there is no escape. Indeed our Legislature was moved to reverse that rule of construction as to instruments executed after January 1, 1954 by *c.* 264, *L.* 1953, to which we will later refer, and the legislature of Rhode Island did so too. *Prince v. Nugent, R. I.,* 172 *A.* 2d 743, 750 (*Sup. Ct.* 1961).

■ We are unable to accept *Wehrhane's* view of the adoption statute of 1877. We think the statute goes beyond merely prescribing a right of inheritance between the adopting parent and the adopted child. It expressly provides for cross-inheritance between natural and adopted children of the adopting parent. Further, the second paragraph of the statute, quoted above, by providing that an adopted child may not take by representation property coming from collateral kindred of the adopting parent, inferentially contemplates the child may so take from lineal kin. And the provision in the same paragraph of the statute that the adopted child shall not be capable of taking property "expressly limited to the heirs of the body of the adopting parent" plainly relates to the interpretation of some instrument and nothing in the statute limits it to the will or deed of the adopting parents.

■ At any rate, it is not important whether the adoption statute directly controls the interpretation of instruments. The important point is that the statute reflects the feeling and attitude of the average man and hence its policy should be followed unless the benefactor explicitly reveals a contrary purpose. In this regard *Wehrhane* observed (23 *N. J.,* at *p.* 210) that society's view of an adopted child has changed since 1877 when the adoption law was enacted. We must disagree. Adoption "was known to the ancients of Greece and Rome, and probably to other ancient peoples, and has been practiced among many of the continental nations under the civil law from the remotest antiquity." 2 *Am. Jur.* 2d, *Adoption* § 2, *p.* 861; *In re Holibaugh,* 18 *N. J.* 229, 233 (1955). True there was no legally recognized right to adopt at common law and hence the right as such depends upon statute as the authorities just cited point out, but our

statute did not generate that familial or social phenomenon. Rather our statute belatedly recognized relationships which men have always assumed, and translated into a rule of law what the Legislature found to be their common expectation and wish.

■ Hence even if the quoted provisions of the adoption statute were thought to speak only of intestacy, they should nonetheless be accepted as a reflection of a common expectation and wish and hence as a guide to proper interpretation of a gift:

"Where the construction of a gift is doubtful after all extrinsic assistance is afforded, the leaning of the court should be to that course of disposition for which public policy pronounces in the statutes of descent and distribution; and this maxim may serve for particular words and phrases of uncertain tenor." 2 *Schouler, Wills, Executors and Administrators* (6th ed. 1923), § 959, *p.* 1111.

As Judge Fuld said in *In re Upjohn's Will*, 304 *N. Y.* 366, 107 *N. E.* 2d 492, 495 (*Ct. App.* 1952): "Wills, too, must be read and construed in harmony with the legislative policy of placing adopted children on a level with natural born offspring." The same thought had been expressed in *Haver v. Herder*, 96 *N. J. Eq.* 554, 558–59 (*Ch.* 1924). To the same effect are *Estate of Heard*, 49 *Cal.* 2d 514, 319 *P.* 2d 637, 640 (*Sup. Ct.* 1957), and *Ansonia National Bank v. Kunkel*, 105 *Conn.* 744, 136 *A.* 588, 591 (*Sup. Ct. Err.* 1927).

The trouble in our State began in 1925 with *Ahlemeyer v. Miller*, 102 *N. J. L.* 54 (*Sup. Ct.* 1925), affirmed 103 *N. J. L.* 617 (*E. & A.* 1927), which introduced the stranger-to-the-adoption concept, an unwarranted assumption that when one who is not a party to the adoption makes a gift to a class consisting of children of the adopting parent, he probably intends to benefit only natural children.

Actually *Ahlemeyer* innovated the doctrine in interpreting a deed and indicated quite plainly that the construction of a will would be another matter. Indeed as late as 1942 it was said the Court of Errors and Appeals had yet to be "called

upon to directly consider and settle the right of an adoptive child to take property under the will of a stranger to the adoption proceedings." *In re Fisler,* 131 *N. J. Eq.* 310, 320 (*Prerog.* 1942). In *Fisler* the Vice Ordinary held that the adopted child of a grandniece of the testatrix was not entitled to take under a gift to the "lawful issue" of the grandniece. It is interesting that in affirming the judgment the Court of Errors and Appeals did not speak in terms of a stranger to the adoption. Rather it said (133 *N. J. Eq.,* at *p.* 423):

"While ever controlled by the context, the word 'issue' signifies, *prima facie,* 'heirs of the body'; and the statute ordains that an adopted child 'shall not be capable of taking property expressly limited to the heirs of the body of the adopting parent or parents, nor property coming from the collateral kindred of such adopting parent or parents by right of representation.' *R. S.* 1937, 9:3–9.
\* \* \* "

Thus the Court of Errors and Appeals went to the adoption statute to interpret the will of a stranger to the adoption, and held against the adopted child, not because the testator was not a party to the adoption, but on the thesis that "issue" means "heirs of the body" as that term was used in the adoption act.

The majority opinion in *Wehrhane* did not accept the theme of *Fisler* that "issue" are "heirs of the body" within the intent of the adoption statute. The reason is that "heirs of the body" referred to the common law estate in fee tail, as the highest court of Massachusetts had held in interpreting the prototype of our statute three years before we adopted it. *Sewall v. Roberts,* 115 *Mass.* 262, 276–77 (*Sup. Jud. Ct.* 1874). This had been noted in *In re McEwan's Estate,* 128 *N. J. Eq.* 140, 146 (*Prerog.* 1940). And of course if *Fisler's* view of "heirs of the body" were correct, an adopted child would not be "issue" even under the will of the adopting parent, a result which would plainly be indigestible. At any rate, the majority opinion in *Wehrhane* (23 *N. J.,* at *p.* 209) expressly rejected the *Fisler* theme, citing *McEwan,* and in reaching the same end result, *i. e.,* that "issue" meant chil-

dren of the blood, it seemingly embraced the stranger-to-the-adoption thesis by speaking of a child or issue "of another" in the excerpt we quoted at *p.* 487 of this opinion. Thus it was not until 1957 that the highest court of this State accepted the stranger-to-the-adoption concept in the search for testamentary intent.

We cannot believe it probable that strangers to the adoption would differentiate between the natural child and the adopted child of another. Rather we believe it more likely that they accept the relationships established by the parent whether the bond be natural or by adoption and seek to advance those relationships precisely as that parent would. None of us discriminates among children of a relative or friend upon a biological basis. See *In re Patrick's Will,* 259 *Minn.* 193, 106 *N. W.* 2d 888, 890 *(Sup. Ct.* 1960) ; *In re Trusteeship Agreement with Nash,* 265 *Minn.* 412, 122 *N. W.* 2d 104, 109 *(Sup. Ct.* 1963). We ought not impute to others instincts contrary to our own. Nor should we think we are different from our ancestors of 1877. As we have said, the adoption act of that year did not amend human nature; it yielded to it.

Finally, it is suggested that to depart from the stranger-to-the-adoption view would invite fraud by permitting a person to adopt someone solely to enable him to take under the will of another. In this connection we are referred to a New York statute (Domestic Relations Law, § 115 *McK. Consol. Laws, c.* 14) which provides that an adopted child shall not be deemed the child of the adopting parent so as to defeat a gift over upon the death of the adopting parent without heirs. It seems to us that the prospect of fraud is quite remote and can be dealt with upon equitable principles if the circumstances are truly compelling. Obviously this prospect did not disturb our Legislature when it adopted *L.* 1953, *c.* 264, discussed later in this opinion, whereby it rejected the canon of testamentary construction *Fisler* had applied and provided without exception that in the construction of any document

thereafter executed an adopted child shall be deemed lawful issue unless the document shall otherwise provide.

For these reasons we will not assume Mrs. Coe intended to deny her beneficence. to a child her foster daughter might one day embrace and adopt as her own. If that intent affirmatively appeared, we of course would enforce her wish. But no such purpose can here be found and hence we are satisfied that the adopted daughters of Theodora are "children" within the meaning of the will.

## II.

As already noted, *Wehrhane* involved "issue per stirpes" and not "children." We have disapproved *Wehrhane's dictum* that "children" presumptively means only natural children in the will of one other than an adopting parent. Our basic approach of course implicates the soundness of *Wehrhane* with respect to "issue" or "issue per stirpes" and the question is whether we should decide now whether *Wehrhane* can stand even as to its actual holding.

Some authorities do suggest that "issue," unlike "children," has a biological connotation. The Vice Chancellor in *Herder, supra*, 96 *N. J. Eq.*, at *pp*. 558–59, posed the question and left it unanswered. In *McEwan, supra*, 128 *N. J. Eq.*, at *p*. 145, the Vice Ordinary thought issue would include adopted children. In *Fisler*, as we have already said, the Court of Errors and Appeals held that issue meant "heirs of the body," and while *Wehrhane* rejected that view of the statutory phrase, it nonetheless found that issue inherently signified the blood line, saying (23 *N. J.*, at *pp*. 208–09) :

"* * * The term in its normal usage connotes progeny to the remotest degree, *Stickel v. Douglass*, 7 *N. J.* 274, 277 (1951), or descendants, *In re Fisler, supra*, 133 *N. J. Eq.*, at *page* 423, and because it is not confined in this sense to one generation it emphasizes the thought of kinship or blood relationship."

Thus, although *Wehrhane* opened with a statement in which children and issue were treated as equivalents, yet at the point of actual decision, it stated a rationale upon which the

words could be readily distinguished. Elsewhere, too, there is some authority which would differentiate children from issue on the basis of the peculiar "biological flavor" of issue. See 3 *Powell, Real Property* § 360, *p.* 132 (1952); Oler, "Construction of Private Instruments Where Adopted Children Are Concerned," 43 *Mich. L. Rev.* 705, 727 (1945).

And it may be noteworthy that when our Legislature undertook to correct "these unfortunate rules of construction," 5 *N. J. Practice (Clapp, Wills and Administration) (3d ed.* 1962) § 213, *p.* 358, it spoke only of issue, perhaps thereby suggesting that that word (and that word alone) had acquired a signification in our cases disqualifying an adopted child. We refer to the statute already mentioned, *L.* 1953, *c.* 264, § 14 (*N. J. S. A.* 9:3–30), effective January 1, 1954, which reads:

"\* \* \* In the construction of any testamentary or other document executed subsequent to the effective date of this act, an adopted child shall be deemed lawful issue of the adopting parent unless such document shall otherwise provide."

Frankly we would not, as an original matter, distinguish among issue, descendants, children, and heirs, since ordinarily the word is not selected by the testator but rather by the scrivener, who, if he were conscious of the question whether adopted children should be in or out, would elicit the testator's wish and express it unequivocally. The cases at most attributed but *prima facie* meaning to such words, and a competent draftsman would not deliberately pick a word which instead of controlling the context is easily colored by it. The caveat against that course has been unmistakable. Annotation, 86 *A. L. R.* 2d 12, 19 (1962).

But the immediate question is whether an equity might be shown in some circumstances with respect to the word "issue" in light of our prior cases and perhaps also in light of the fact that *L.* 1953, *c.* 264 which we just quoted overturned the judicial view of issue prospectively only. As to the effect of prospective legislation upon the judiciary's re-

sponsibility for pre-existing situations, see *In re Arens,* 41 *N. J.* 364, 384–87 (1964). We think the sound course is to leave the question open so that the possible equities may be weighed in a specific setting.

In summary, then, we will not extend *Wehrhane* and if that case is to be followed at all, it will be confined to its precise holding.

The judgment is therefore reversed and the matter remanded for proceedings not inconsistent herewith.

HALL, J. (dissenting). It seems to me that, in resolving the kind of will construction problem presented in this case where there is nothing in the language of the instrument or in competent evidence to demonstrate a contrary intent of the testator, a court must be governed by the law at the time of execution. 5 *N. J. Practice (Clapp, Wills and Administration)* (*3d ed.* 1962) § 193, *p.* 287. In other words, since we cannot know whether the particular question was ever discussed between testator and scrivener and therefore actual intent can never be disclosed, the only proper and safe thing to do is to assume conclusively that the testator intended the scrivener's language to be construed in accordance with the law at that time. Conversely, we also must presume that the scrivener knew what that law was and that the language he used was deliberately chosen to express it. He cannot be criticized or his intent questioned where he used terminology entirely proper and consistent with the law of his time, even though we today might feel it desirable to be more explicit.

At the time this will was drawn, the common law was well settled generally, and well understood to be such by New Jersey lawyers, that an adopted child could not take as a "child" under the will of a stranger to the adoption. I am equally confident that such understanding has in fact continued without doubt until this very moment. See concurring opinion of Justice Jacobs and authorities there cited in *In re Wehrhane,* 23 *N. J.* 205, 211 (1957), taking the same point of view with respect to the testamentary language there present

which I am now espousing as to slightly different words. I think it also clear that the majority's view of the meaning and effect of our 1877 adoption statute was not that of lawyers in 1897 or indeed that of our courts until now. It seems improper to say at this late date, as the majority opinion in effect actually does, that the common law of New Jersey was wrong for sociological or any other reasons where the result is to change substantially and retroactively those who are to take under a probated will, no matter how we in 1964 may feel about its legal correctness or over-all desirability. Apparently the Legislature was proceeding along this line of thought when it adopted *L.* 1953, *c.* 264 (*N. J. S. A.* 9:3–30), effective January 1, 1954 as to future executed wills only. This is not the situation of a modification of a mere rule of estate administration like that which was held in *In re Arens,* 41 *N. J.* 364, 386–387 (1964), to be capable of retroactive change.

I would affirm the judgment of the Chancery Division.

JACOBS, J., concurring in result.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN — 6.

*For affirmance*—Justice HALL—1.