# STANDLEY EVANS ET AL. v. LOWELL W. McCOY ET AL.

[No. 115, September Term, 1980.]

*Decided October 23, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Melvin J. Sykes,* with whom was *William B. Evans* on the brief, for appellants.

*William W. Cahill, Jr.,* with whom were *William H. Holden, Jr., Richard C. Burch* and *Weinberg & Green* and *Leonard H. Lockhart* on the brief, and by *Diana G. Motz, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellees.

RODOWSKY, J., delivered the opinion of the Court.

This case involves whether adopted adults are "issue" under a will effective before the general adoption statute provided for adult adoptees. At stake is a farm devised to the testator's children, none of whom had natural offspring. The devise is in fee, determinable "[i]n the event all of [the testator's] children . . . shall die without leaving issue living at the time of their death. . . ." The surviving child made the adoptions late in life, as a step in her sale of the farm. Those who would take the gift over claim that the adoptions do not avoid the condition of defeasance and that the expressly retroactive statutory rule, under which "issue" includes any adopted person, absent a contrary intent plainly appearing from the will, is unconstitutional. Our opinion is that the statute is valid and controlling, and that the condition does not operate.

The testator, Amos S. Evans, late of Cecil County, Maryland, died in 1899. Amos owned a farm of over 200 acres near Rising Sun. He was survived by his widow, Agnes, by a daughter, Rebecca, born November 21, 1896, by a posthumously born son, James Hugh, and by two brothers, James Hugh Evans and William S. Evans. William S. Evans, a practicing attorney in Elkton, prepared Amos' longhand will of June 4, 1897. We are concerned here with the disposition of the residue under paragraphs 3 and 4 of the will which provide:

> 3—The rest and residue of my property and estate real, personal and mixed, I give devise and bequeath unto my daughter Rebecca S. Evans and

any other children who may be born to me hereafter, either before or after my death, and the survivor and survivors of them share and share alike.

4—In the event that all of my children (born in my lifetime or posthumous) shall die without leaving issue living at the time of their death, or in the event that I shall die leaving no children surviving me, whether born in my life time or posthumous, then I give devise and bequeath the said rest and remainder of my estate mentioned in paragraph three aforesaid hereof equally unto my brothers James H. Evans and William S. Evans and their heirs, it being my intention, and I so devise, give and bequeath that if either or both of my said brothers should be deceased at the time of the happening of said contingency, the share to which they (my said brothers) would each be entitled under the provisions hereof shall vest in their respective heirs at law.

The testator's son died in 1962 without issue but survived by a widow, Helen. Rebecca married Earl R. Kirk who died in May 1977. Rebecca died on May 27, 1978 without having had any natural children but after she and her husband had adopted two adults. Amos' brother, James Hugh, died without issue in the 1920's. Amos' brother, William, died in 1919. He had eight children. The heirs of William are the plaintiffs-appellants in this case.

Following the death of her brother in 1962, Rebecca leased the farm but she was not receiving sufficient income from it to suit her. Over the years she made repeated efforts to sell the property.

In about 1970 Rebecca, who resided in Wilmington, engaged Delaware counsel to assist in a sale of the property. On August 14, 1973 a contract of sale was signed. The contract covered 208 acres at a purchase price of $187,200, of which 71% was payable in four equal annual installments to be secured by a take-back purchase money mortgage. The

buyer was an agent for appellee Lowell W. McCoy (McCoy). William B. Evans, one of the appellants, put counsel for McCoy on notice of the provisions of Amos' will. On November 7, 1973 counsel for McCoy wrote to Rebecca's attorney rejecting the title. The letter enclosed a memorandum from a legal research service which suggested that an adoption by Rebecca might solve the title problem. In a letter which Rebecca's attorney wrote in 1979, in connection with his claim against Rebecca's estate for legal services, he described the adoption procedure as having been worked out in consultation with, *inter alia,* McCoy's attorney, and that it "was our thought that we may by pass the contingent remaindermen in the Amos S. Evans' estate by seeking relief offered under" the section of the Maryland adoption statute dealing with construction of wills.

Under a decree entered November 16, 1973 by the Superior Court of New Castle County, Delaware, Rebecca and Earl Kirk adopted a married 21-year-old, Kathleen Lucille Husfelt. Rebecca was then 76 years of age. Delaware procedure for adult adoptions required no notice to any of the relatives of Rebecca nor any evidentiary hearing concerning the reasons for the adoption. On her deposition in these proceedings Mrs. Husfelt testified that the idea of the adoption originated with Rebecca and that the adoption made no practical difference in her relationship with Rebecca. Mrs. Husfelt had known the Kirks as neighbors for 10 or 11 years. Mrs. Husfelt said she was at the Kirks' home "every weekend, maybe during the week a couple of times" and that she and the Kirks went on trips together.

The sale to McCoy closed on July 12, 1974 under a written escrow agreement between McCoy and Rebecca and her sister-in-law, the widow of James, as "obligees" [1] which recited "the uncertainty recognized by all parties of whether or not the said Deed vests or will vest fee simple absolute title in

---

1. Rebecca's sister-in-law was also a seller under the contract of sale and a grantor on the deed to McCoy. Appellants state that Rebecca's sister-in-law had no possible interest in the farm under Amos' will. In any event, the reasons for the inclusion of the sister-in-law in the arrangement are immaterial to the instant matter.

McCoy. . . ." In broad outline the escrow agreement provided that the cash deposit and the cash paid at closing would be held in escrow and that the deferred payments would be made into escrow. The condition of the escrow turned on the title, if any, to be obtained by McCoy at Rebecca's death. If a "court of final jurisdiction" decreed that McCoy had good fee simple absolute title to the property, then the escrowed funds, less a legal fee not to exceed $50,000, were to be paid equally to the obligees, their representatives and assigns. If McCoy did not obtain title, the escrowed funds, and accrued interest thereon, were payable to McCoy. In addition, and outside of the escrow, interest at the rate of 7% per annum was payable on the unpaid balance of the deferred portion of the purchase price to the obligees during Rebecca's life, and thereafter into escrow. During Rebecca's life, and beginning with the fifth year from the date of closing, McCoy was to pay to the obligees $2,212 annually which was agreed to represent the then present annual net income from the farm.

In August 1975 McCoy's counsel, in a letter to Rebecca's counsel, pointed out the possibility that the adoptee, Mrs. Husfelt, might predecease Rebecca and suggested that Rebecca "consider adopting at least one more person so that the odds will be increased that [Rebecca] will leave adopted issue surviving."

On March 26, 1976 in the New Castle County, Delaware court, Rebecca and Earl Kirk adopted Janet Ann Facciolo, who was married and age 53. Rebecca was then age 79. Mrs. Facciolo was a first cousin of Rebecca on Rebecca's mother's side. Rebecca and Mrs. Facciolo would visit occasionally. Rebecca told Mrs. Facciolo that she wanted to adopt her "on account of this land in Maryland."

Neither of the adoptees was promised any money or other advantage in return for her consent to be adopted.

Rebecca executed her Last Will and Testament July 29, 1976. It appointed Mrs. Husfelt and Mrs. Facciolo as co-executrices, without bond, and gave them her estate in equal shares in the event, as was the case, that Rebecca's husband predeceased her. Both adoptees survived Rebecca.

In October 1978 the appellants brought this action of eject-
ment. The trial court entered summary judgment in favor of
the appellees.[2] We granted certiorari prior to consideration
of the case by the intermediate appellate court.

## I

The ultimate question is whether the adoptees are "issue"
of Rebecca under her father's will. In order better to un-
derstand the arguments advanced, it is desirable to review
the general legal background out of which the case arises.
The first adoption statute in Maryland was Chapter 244 of
the Acts of 1892. It applied only to minor children. Md. Code
(1888, 1898-1900 Supp.), Art. 16, § 62A. Under that Act the
effect of a decree of adoption was "to entitle the child so
adopted to the same rights of inheritance and distribution as
to *the petitioner's* estate . . . as if born to such petitioner in
lawful wedlock. . . ." *Id.,* § 62C. (Emphasis added). Section
62E provided that the "term 'child' or its equivalent in a
deed, grant, will or other written instrument shall be held to
include any child *adopted by the person executing the same,*
unless the contrary plainly appears by the term [*sic*] thereof,
whether such instrument be executed before or after the
adoption." (Emphasis added). These provisions were in effect
at the time of Amos' 1897 will.

Special laws had occasionally been passed by the General
Assembly providing that a certain named adult person
should thereafter be the adopted child of another named
person,[3] but the general adoption statute was not amended

---

**2.** In addition to McCoy, the defendants below were the State Highway
Administration of Maryland (SHA), the Secretary of the State Department
of Transportation and the State Highway Administrator. This was because
SHA's predecessor agency had taken, in 1956 and 1965, conveyances of parts
of the farm, in each instance without any participation in the transaction
by, or consideration to, the heirs of William S. Evans. The trial court dis-
missed SHA on grounds of sovereign immunity but overruled motions of the
state officials asserting that defense. None of these rulings is challenged on
this appeal. Judgment below on the merits was favorable to these state
officials and they are appellees with McCoy.

**3.** Strahorn, *Adoption in Maryland,* 7 Md. L. Rev. 275, 283 (1943).

to include the adoption of adults until the enactment of Chapter 172 of the Acts of 1937.

The rule embraced in the 1892 general adoption statute, by which the presumed inclusion of an adopted child within the term "child," or its equivalent, was limited to instruments executed by the adoptive parent, is known as the "stranger to the adoption rule." *See* Halbach, *The Rights of Adopted Children Under Class Gifts,* 50 Iowa L. Rev. 971, 978-998 (1965). Thus, it was held in *Eureka Life Insurance Co. v. Geis,* 121 Md. 196, 199, 88 A. 158, 159 (1913) that an adopted child did not take under the will of the mother of the adoptive father where the gift was to the adoptive father for life and then to his children equally.

A substantial revision of the adoption laws became effective June 1, 1947, under Chapter 599 of the Acts of that year. Included was the elimination of the stranger to the adoption rule from the statute. "Child" in a will meant "any adopted person," unless the contrary plainly appeared by its terms.[4] At the same time the laws of intestate distribution were amended to provide that "[an] adopted child shall take from, through and as a representative of its adopting parent or parents" and their "lineal or collateral kindred ... in the same manner as a child by birth. ..." Code (1939, 1947 Cum. Supp.), Art. 93, § 139A.

*Gutman v. Safe Deposit and Trust Co.,* 198 Md. 39, 81 A.2d 207 (1951) held that the 1947 amendment did not apply to wills executed and effective before its enactment. However, the General Assembly rejected prospective application, as applied in *Gutman,* for the 1947 rule. By Chapter 287 of the

---

4. Md. Code (1939, 1947 Cum. Supp.), Art. 16, § 85K (c). New matter in relation to the 1892 statute is in italics and matter deleted from the 1892 version appears in brackets:

The term "child" or its equivalent in a deed, grant, will or other written instrument shall be held to include [any child adopted by the person executing the same,] *any adopted person,* unless the contrary plainly appears by the terms thereof, whether such instrument [be] *was* executed before or after [the adoption] *the entry of the interlocutory decree of adoption, if any, and if none, before or after the entry of the final decree of adoption.*

In 1957 "heir" and "issue" were added to this rule of construction (Ch. 247). "Descendant" was added in 1961 (Ch. 287).

Acts of 1961 it added the language italicized below. At the time of Rebecca's death on May 27, 1978, Md. Code (1957, 1973 Repl. Vol.), Art. 16, § 78 (c) provided:

> The term "child," "heir," "issue," "*descendant*" or an equivalent in a deed, grant, will or other written instrument shall be held to include any adopted person, unless the contrary plainly appears by the terms thereof, whether such instrument was executed before or after the entry of the interlocutory decree of adoption, if any, and if none, before or after the entry of the final decree of adoption; *in the event such instrument was executed prior to June 1, 1947, the provisions of this subsection shall apply to those adopted persons as to whom the interlocutory decree of adoption, if any, and if none, the final decree of adoption was entered on or after June 1, 1947.* [Italics supplied.]

The effect of the 1961 amendment was involved in the five *Purifoy* cases discussed below. The ultimate question in that litigation was whether a child who had been adopted into the Bauernschmidt family on January 13, 1948 took a gift to "children" or "descendants" of her adoptive father under wills and a deed of trust which were executed by various members of the adoptive father's family in the period between 1911 and 1935 and all of which were effective prior to June 1, 1947. In *Purifoy* I (*Purifoy v. Mercantile-Safe Deposit and Trust Co.,* 398 F. Supp. 1075 (D. Md. 1974) it was held that since the instruments and surrounding circumstances failed to reveal that the contingency of adoption was ever considered, no actual intention of the makers concerning adopted children was present. Questions of interpretation and of prospective or retroactive application of the 1961 amendment were certified to this Court. In *Purifoy* II (*Purifoy v. Mercantile-Safe Deposit and Trust Co.,* 273 Md. 58, 67, 327 A.2d 483, 488 (1974)) we held that the 1961 amendment rendered the 1947 amendment "retrospective, so that the terms 'child,' 'children,' 'descendants,' and the

equivalent in instruments executed and effective prior to June 1, 1947, include adopted children where the adoption occurred after June 1, 1947." We expressed no opinion on the constitutionality of the retrospective application. On return to the United States District Court in *Purifoy* III, it was held that § 78 (c) of Article 16 provides a rule of evidence and not a rule of substantive law and that it could constitutionally be applied to instruments executed and effective before June 1, 1947. *Purifoy v. Mercantile-Safe Deposit and Trust Co.,* 398 F. Supp. 1082 (D. Md. 1975). On appeal to the United States Court of Appeals for the Fourth Circuit that Court again certified a series of questions to this Court which we answered in *Purifoy* IV (*Mercantile-Safe Deposit and Trust Co. v. Purifoy,* 280 Md. 46, 371 A.2d 650 (1977)). Within the framework of the finding by the District Court that the makers of the instruments had no actual intention with respect to adopted children, this Court held that the District Court had properly applied Maryland rules relating to construction. We said that "[b]y force of the statutory language contained in § 78 (c) a determination respecting membership in a class of 'children' to be ascertained in the future is governed by the law in effect at the time membership in the class is determined, *i.e.,* by reference to the provisions of § 78 (c), unless the maker expressed an actual intention that the future class determination be governed by the law in effect at a different time." *Id.* at 57, 371 A.2d at 657. In answer to the fifth certified question we said that the adoptee's interest in the remainders "vested in 1961 when the 1961 amendment to § 78 (c) afforded retroactive application to pre-1947 instruments, and that interest vested absolutely in 1972" on the death of the life tenant-adoptive father. *Id.* at 59, 371 A.2d at 658. There was no opinion of this Court on the statute's constitutionality.

Judge Smith, joined by Judge Digges, dissented. On one level of analysis the dissenters argued against a retrospective construction of § 78 (c) because of the well established principle in Maryland that a will is to be construed according to the law in force at the time it takes effect. They considered it improper to define intention by

using a statute which did not come into existence until many years after the effective date of the instrument, in the absence of a clear indication in the instrument that law of a later date should be used. The dissenters were also of the view that § 78 (c) could not be retrospectively applied because the interests of those who would take remainders by gift over, on the death of the adoptive father without surviving children, were sufficient to be protected under present Article 24 of the Maryland Declaration of Rights.[5]

*Purifoy* V is the *per curiam* opinion of the Fourth Circuit. *Purifoy v. Mercantile-Safe Deposit and Trust Co.,* 567 F.2d 268 (4th Cir. 1977). That Court said the views of the dissenters in *Purifoy* IV "sharpen the implications of the majority opinion" and held that, under the Fourteenth Amendment's due process clause, there was no "unconstitutional retroactive divestiture of interests already vested" because "under Maryland law, as enunciated by its Court of Appeals, those interests did not absolutely vest until the death of the life tenant . . . ." *Id.* at 269.

Two additional statutory provisions in effect at Rebecca's death bear on the construction of "issue" in Amos' will. With respect to foreign adoption decrees, Code (1957, 1973 Repl. Vol.), Art. 16, § 80 in part provides:

> The status of adoptive relationship created by a valid final decree of adoption in another jurisdiction shall be given full faith and credit by the courts of this State. When the question is properly presented to a court in this State and if the party against whom judgment would be rendered is subject to the jurisdictional processes of the courts of this State, the courts shall apply the legal effects of a final decree of adoption made in this State to such

---

**5.** Md. Constitution, Declaration of Rights, Art. 24, in relevant part provides:

> That no man ought to be . . . deprived of his . . . property, but by the judgment of his peers, or by the Law of the land.

adoptive relationship created by a final decree of adoption in another jurisdiction.

As to the adoption of adults, Code (1957, 1973 Repl. Vol., 1977 Cum. Supp.), Art. 16, § 82 states that the "legal effect of an adoption of a person over 18 years of age shall be the same as that of the adoption of a minor, except as to guardianship."

Amos' will, stripped to the essentials relevant here, devised a determinable fee in the farm to Rebecca and an executory interest in it to the heirs of William. *Devecmon v. Shaw,* 70 Md. 219, 16 A. 645 (1889). The fee would shift to William's heirs on Rebecca's death without leaving issue surviving her. Certain themes run throughout appellants' arguments as to why the adoptees are not "issue." They correctly assert that at the time Amos made his will and at his death the general adoption statute did not then encompass the adoption of adults. They emphasize that Rebecca sought to use adult adoption to "remove" a restriction on the estate devised to her. Central to the controversy is the retroactive rule of § 78 (c) which would include the adoptees as "issue." Appellants frame three arguments designed to avoid, or void, that statute. They are that:

1.  It plainly appears by the terms of Amos' will that "issue" does not include any adopted person;
2.  The reference to "any adopted person" in § 78 (c) should be construed to exclude a person adopted under the circumstances presented here; and
3.  Application of § 78 (c) in this case would be unconstitutional.

## II

As to whether the terms of the will plainly show an intent to exclude adoptees, appellants argue that Amos "could not have conceived that 'issue' could include an adopted adult," that it would have been "absurd" to have defined "issue" in the will to exclude adopted adults who could not possibly have been included, and that there was no basis for reason-

able contemplation that some day "issue" might include adopted adults. In essence the argument is that "issue," standing alone, not only includes direct, lineal, blood descendants but also makes plain an intent to exclude adopted persons. This is contrary to *Purifoy IV* where we said that "[b]y its enactment of § 78 (c) the Legislature plainly recognized that the bare use of terms such as 'child,' 'issue,' 'heir' and their equivalent in trust instruments sheds no real light on the maker's actual intent with respect to adopted children." 280 Md. at 56-57, 371 A.2d at 656-57. As Judge Northrop pointed out in *Purifoy I*, the words construed in § 78 (c) "*by themselves* do not indicate the actual intention of the testator towards adopted children. Otherwise the Legislature would not have assumed the task of assigning a meaning to the words." 398 F. Supp. at 1079 (emphasis in original).

Secondly, the appellants point to the inclusion in the will of a condition of defeasance with a gift over. This they say demonstrates an intent not to permit the condition to be rendered ineffective at Rebecca's option by her adoption of adults. If valid, this argument would not be limited to adult adoptions, since it turns not on who is adopted but on the presence of the condition.

Appellants' contention, based on the presence in Amos' will of this particular condition, cuts too broadly. Here the gift is to Rebecca, but if Rebecca dies without leaving issue surviving her, then to the heirs of William. Amos' intent as to adoptees in selecting "issue" for use in the condition of defeasance is not plain from the instrument. The term is not even used to insure that his children's "issue" would take under his scheme of disposition. If Rebecca had had a natural child, the farm was not restricted to that child on Rebecca's death. She could have devised it out of the bloodline. Had Amos meant for the farm to stay in the family for his grandchildren, if any, he did not say so. The condition used does not demonstrate so clear an intent to restrict exclusively to the blood as to overcome the statutory presumption.

Nor do we see, for purposes of avoiding § 78 (c), why the use of "issue" in a condition which does not further clarify

the term supplies the plain meaning as to adoptees which the Legislature has said is lacking from the word alone. For example, if the gift were "to A for life and, upon the death of A leaving issue surviving A, then to the issue of A [construed as words of purchase], but if there be no issue of A surviving A, then to the heirs of B," appellant's argument would deem the use of "issue" in these conditions sufficient to avoid § 78 (c) and to exclude adoptees. Whether the class terminology is used solely to set forth a condition, or whether it is used to describe both the condition and the takers upon occurrence or failure of the condition, is not material under § 78 (c). What is material to avoiding the operation of § 78 (c) is whether it plainly appears from the terms used, other than the generic one, that the intent is to exclude adoptees.

Appellants also rely on item 3 of the will which leaves the residue to Rebecca "and any other children who may be born to me hereafter. . . ." Turning then to item 4 which refers to the contingency that "all of my children . . . shall die without leaving issue," appellants say that "children" as used in item 4 necessarily refers to children born to the testator, in the same sense as expressly set out in item 3. From this appellants conclude that the parallel structure of "issue" with "children" in item 4 indicates that "issue" is also to be understood in the sense of persons born to Rebecca and not adopted. We intimate no opinion as to whether a rule of parallel construction would even be applicable here, absent § 78 (c). However, reliance on that rule of construction, which necessarily means the intent is not clear on the face of the words used, does not satisfy the requirement of § 78 (c) that the intent contrary to the inclusion of adoptees plainly appear from the terms of the instrument.

### III

Appellants also argue that § 78 (c) should be construed to be inapplicable to the facts here. They say:

> The term "issue" as used in Amos Evans' will does
> not include the adults adopted by [Rebecca] when

she was [nearly] 77 and 80 years old because "adopted person" within the meaning of the presumption established by the statute means a person whose adoption is bona fide and consistent with the underlying policy of the adoption statutes and not for the fraudulent or improper purpose of "bypassing" a gift over to remaindermen and nullifying the condition testator explicitly imposed on the estate granted to the adopting party.

On this phase of the case the trial court summarized the record by stating that § 78 (c) "provided a method by which the contingent interests could be defeated," that "the advantage of that statute was sought by [Rebecca]" and that "her use of the statute had an ulterior motive, [namely] to permit the sale of the real estate and defeat the contingent interests. . . ." The trial court concluded that this use of the statute was not prohibited and was legally effective to prevent the occurrence of the condition of defeasance.

There are at least three steps in appellants' argument. The first element requires that there be enunciated a policy of the law which refuses to recognize under certain circumstances one or more of the effects of an adoption. Next, the circumstances of the instant case would have to fall within that policy. Thirdly, this Court, as a matter of statutory construction, would have to be able to read the policy into § 78 (c).

At the threshold the parties cite *Ex parte Libertini,* 244 Md. 542, 224 A.2d 443 (1966), which was an appeal from the dismissal of an adoption petition. A 56-year-old unmarried sergeant in the Women's Army Corps sought to adopt an unmarried 35-year-old captain in that Corps. The trial court dismissed the petition without hearing and we reversed on the ground that nothing in the statute required the adopting person to be married. McCoy finds comfort in our statement that "the Maryland statutory provisions permit the adoption of an adult by an adult for purposes of inheritance. . . ." *Id.* at 544, 224 A.2d at 444. Appellants see significance in our reference to the

Chancellor, on remand, "making his determination as to whether there are any compelling reasons why the petition for adoption should not be granted. . . ." *Id.* at 544, 224 A.2d at 445. We see very little assistance in *Libertini* for resolution of the problem at hand. Here we deal with completed adoptions which are facially valid under Delaware law. Here we are asked to look behind the decrees to the motives underlying the adoptions, for the purpose of determining whether the law will refuse to consider the adoptees as the issue of Rebecca in the face of § 78 (c)'s literal application.

There are a number of cases in which the question of whether an adult adoptee takes under the wording of an instrument has been raised. At the level of the reasoning expressly articulated by the court, these cases generally are decided on the "intent" of the testator without reference to statutory aids designed to assist in resolving the problem. They have gone both ways. *See* Annot., 21 A.L.R.3d 1012, 1038-1044 (1968).[6] From the standpoint of the motive of the one adopting, the decisions of other courts do not reflect any consistent approach.

The argument that the adoption of an adult and of the adult's two minor children was not made in good faith, but merely for the purpose of bringing the adopted persons under a will to the exclusion of the taker of a gift over, was made to the Supreme Court of California. That court, in dicta, observed that "it is doubtful if [the adopter's motive] would be significant . . . unless it showed the invalidity of the

---

**6.** The highest court in Kentucky, acting in the absence of any statute bearing on determining intent, has turned 180 degrees on the intent problem in some inter-spousal adoption cases. Where the gift was to A for life with remainder to his "heirs at law" and if none, to a school, and A, at age 58 adopted his 45-year-old wife, Bedinger v. Graybill's Executor, 302 S.W.2d 594 (Ky. 1957) held that the wife took inasmuch as the adoption was permitted and the wife was thereby A's "heir at law." If the gift were to "children" of the testator's child, however, this included neither stepchildren adopted when they were age 48 and 52, Wilson v. Johnson, 389 S.W.2d 634 (Ky. 1965), nor the husband of testatrix's daughter, adopted by his wife, Pennington v. Citizens Fidelity Bank & Trust Co., 390 S.W.2d 671 (Ky. 1965). Then, in Minary v. Citizens Fidelity Bank & Trust Co., 419 S.W.2d 340 (Ky. 1967), where the gift was to the testatrix's heirs and where her son adopted his wife, the wife did not take. *Bedinger* was in effect overruled because "there is no doubt but what the intent of the testatrix, as to the disposition of her property, was circumvented." *Id.* at 343.

adoption which it does not." *In re Stanford's Estate,* 49 Cal. 2d 120, 142, 315 P.2d 681, 694 (1957). Under a Kansas decision, *Meek v. Ames,* 177 Kan. 565, 570-71, 280 P.2d 957, 962 (1955), an adoptee was allowed to take under the will of a stranger to the adoption who died in 1914, before adult adoptions were authorized, and three years before the age of majority for females was increased from 18 to 21. The devise was to the testator's daughter for life, remainder to her children and, if none, to the plaintiffs. In 1937 the life tenant and her husband, who were childless, adopted a 19-year-old female, who continued to reside with her natural mother and never resided with her adoptive parents. Eight days after the life tenant's death, the property was deeded to her husband by the adoptee. The plaintiffs claimed that the testator could not have intended such an adoptee to take and that there was a conspiracy and a fraud on their rights of inheritance. The court said that the testator knew that the applicable statutes were subject to change at any time and held that adoption plus survival by the adoptee of the life tenant did not perpetrate a fraud on those who would otherwise take the land. A subterfuge argument was also advanced in *Brock v. Dorman,* 339 Mo. 611, 98 S.W.2d 672 (1936) where the gift was to the testator's son for life and after his death to the son's heirs. The rule in Shelley's case had been abolished in Missouri. The son, two and one-half years before his death, adopted a 43-year-old woman. Because the adoptee answered the description in the will, the court reasoned that "[i]t is therefore wholly immaterial how, or because of what events, actions, or occurrences, such remainderman came to be within that designation." *Id.* at 617, 98 S.W.2d at 676.

Appellants emphasize *Chichester v. Wilmington Trust Co.,* 377 A.2d 11 (Del. 1977), *aff'g,* 369 A.2d 701 (Del. Ch. 1976). The case involved the estates of a childless married couple. The husband, by a 1932 inter-vivos trust and by a will effective in 1947, and the wife, by a will effective in 1975, made gifts to the "issue," *per stirpes,* of the wife's mother, Eliza. One stirp consisted entirely of adoptees, the stepchildren of one of Eliza's sons as a result of his 1949

marriage. They were adopted as adults under the laws of Maryland in 1964. The Delaware adoption statute (13 Del. Code, § 954) treated adult adoptees "to all intents and purposes as if [they] were the lawful and natural offspring" of the adoptive parent. Those who would have taken enlarged gifts by the exclusion of the adoptees argued that, although Delaware had abandoned the stranger to the adoption rule as to minor adoptees, the rule was in effect as to adults. It was held that the adoptees took under the instruments. The court said (*id.* at 13-14):

We ... construe Section 954 to permit adult adopted persons to take as issue under the instruments in question, where no intent to the contrary appears therein. The arguments concerning legislative and judicial policy are not persuasive, as recent decisions of this Court have permitted adopted children to inherit through as well as from their adoptive parents. [cit. om.] These decisions did not in any way restrict the rights of adult adoptees; rather, they evidence a trend begun in 1952 by a substantial revision of the adoption statutes 48 *Del. L.* ch. 134, toward liberalization of the rights of all adopted persons, whether minor or adult. Nor do we perceive in the General Assembly's failure to amend Section 954 or its predecessors a policy restricting the inheritance rights of adult adopted persons. Rather, we find an intent on the part of the General Assembly, evidenced in certain definitional sections of Title 12, to permit adult adoptees to inherit through as well as from their adoptive parents.

The court found support for its conclusion in Title 12 of the Delaware Code, a 1974 revision of the statute governing decedents' estates,[7] which the court considered to be relevant because it was enacted prior to ascertainment of the classes involved before it. Section 101 provided definitions

---

7. 59 Del. Laws, ch. 384. By § 3 it applies to estates of decedents dying on or after December 25, 1974.

"[f]or the purpose of wills" under which "issue" referred to the relationship of parent and child, and "child" included one taking as a child by intestate succession. Section 508 of Title 12, dealing with intestate succession, provided that an adopted person was the child of an adopting parent for the purpose of determining succession by, through or from a person. The court said that under its decisional law the adopted persons would clearly have taken if they had been adopted as minors and that it found "in neither the statutes nor the cases any rational reason for a different result because they were adopted as adults." It construed the adult adoption statute "to require the same result in the case of a child adopted as an adult" as in the case of a child adopted while a minor. *Id.* at 14.

Having so held, the Delaware court then expressed the dicta to which appellants have made reference (*id.* at 14-15):

> In considering the contention that adoptions could be used to perpetrate a fraud or to prevent the operation of a gift over, we bear in mind that no such allegation has been made in this case; the resolution of such a question will be left to the future. The finality of adoption does not preclude inquiry into its purpose in the context of determining a class of beneficiaries, and the intent or purpose of the testator or trustor can always be examined to determine if he intended to benefit adopted individuals.

While the Delaware court has left the door slightly ajar by this dicta, it furnishes no guide to the circumstances under which it would be applied, other than that it will be based on the intent of the testator.

The Supreme Court of Pennsylvania has taken a different approach. Prior to 1972 Pennsylvania case law held that, in the absence of testamentary language demonstrating a contrary intent, a gift to children by a stranger to the adoption was presumed to exclude adopted persons. This judicially established presumption was converted to one of inclusion by *In re Estate of Tafel,* 449 Pa. 442, 296 A.2d 797 (1972).

But the new rule was expressly limited to instances where the adoptee was a minor at the time of the adoption. By that restriction on the judicial rule of construction the court said "we serve and effectuate the purpose of preventing an adult adoptee or adoptees from being considered a testamentary 'child' or 'children' where such adoption is undertaken by a person other than the testator to prevent a gift over in default of a natural 'child' or 'children' and thus, in effect, rewrite the testator's will." *Id.* at 454, 296 A.2d at 803.

An intermediate appellate court in California has announced yet a different, and three step, rule for the judicial interpretation of testamentary gifts to children where an adult adoptee claims and where the instrument was executed prior to the time when that state's adoption statutes included adults. First, adult adoptees are generally considered to be excluded. Secondly, there is an exception from the exclusion for those persons who, as minors, had entered the home of the adoptive parents and were reared and educated as part of the family of the adoptive parents. Thirdly, the court announced there will be an exception to the exception where it is shown that "the purpose of the adoption was to diminish or defeat the income and remainder interests of other beneficiaries ' "for purposes of financial gain or as a spite device." ' " *Estate of Pittman,* 104 Cal. App. 3d 288, 295, 163 Cal. Rptr. 527, 531 (1980). The case was remanded for further proceedings.

The *Pittman* court acknowledged that its rule was inspired by Halbach, *The Rights of Adopted Children Under Class Gifts,* 50 Iowa L. Rev. 971, 988 (1965) (hereinafter "Halbach"). Halbach decried the stranger to the adoption rule and urged the inclusion of adoptees, as "children" or the equivalent, under instruments whether or not executed by an adoptive parent. In Halbach's view, the circumstances ordinarily surrounding adoption of a minor, including the assumption of the responsibilities of parenthood, give circumstantial assurance that the presumed intention of the testator is carried out. However, his judgment was that the use of adoption as a means of deliberately affecting succession was an abuse, and that the circumstantial assur-

ances generally found in the adoption of minors did not apply to adult adoptions since there would usually be no obligation of support incurred. For these reasons he suggested that a *"loco parentis"* element should be present in adult adoptions before a court construed "child" to include adoptees in an instrument which expressed no contrary intent. *Id.* at 990-91.

Were this Court to undertake to state a principled rule for determining the type of adoptee who is not legislatively intended to be an "adopted person" under § 78 (c), the threshold problem would be the lack of any unanimity on what the test should be. The line cannot be drawn between adults and minors since adoption of adults is expressly permitted. If, as appellants suggest, the policy declarations of Art. 16, § 67 be utilized, which are phrased in terms more appropriate to the adoption of minors, the same conflict with the adoption of adults would result. If a purpose of the one adopting to defeat a gift over became controlling, the rights of adopted minors to take under class gifts which are followed by a gift over would be subject to litigation in all cases. If a purpose test were limited to cases involving the adoption of adults, we would encroach on the policy announced in Art. 16, § 82 by which the legal effect of the adoption of an adult "shall be" the same as that of the adoption of a minor.[8] Were we to say that an adoptee fails to meet the description contained in an instrument where the adoption has the effect of defeating the testator's intent, it would merely beg the question. It is a given in the instant problem that the instrument does not make the testator's intent plainly appear. For us to say that courts should in the first instance apply historic, judicial rules of construction in order to determine the testator's intent and then, if that determination is inconsistent with the result obtained under § 78 (c), assert that an "exception" to the statute's provisions has been satisfied, we would effectively be repealing the statute.

---

**8.** Halbach, *supra,* at 994, suggests *legislation* which "would incorporate an arbitrary age restriction in order to limit the adoptions that will qualify an adoptee as a child of adoptive parents" under written instruments.

Appellants have impressively marshaled statutory construction decisions of this Court in order to demonstrate the reach of the statutory construction process. However, here there is no clear, societal consensus to support a judicially inferred exception (which, it is claimed, the General Assembly intended) to the provisions of § 78 (c). *Cf. Sanza v. Maryland Board of Censors,* 245 Md. 319, 226 A.2d 317 (1967) (although censorship statute defined "film" and "view" in broad terms which would literally require a license for a person exhibiting a home movie of his children or for a store selling a scenic slide, the statute was construed as applicable only to films shown commercially for profit).

Section 78 (c) is analogous to a New Jersey statute [9] which was described as being without exception in *In re Coe,* 42 N.J. 485, 201 A.2d 571 (1964). In *Coe* the court reconsidered and rejected its previous stranger to the adoption rule as to instruments executed prior to the statute. In considering an argument much like that made by the appellants here, the court expressed a contrast between those instruments which would be governed by its judge made law and those which would be governed by the new statute (*id.* at 492-93, 201 A.2d at 575-76):

> Finally, it is suggested that to depart from the stranger-to-the-adoption view would invite fraud by permitting a person to adopt someone solely to enable him to take under the will of another. . . . It seems to us that the prospect of fraud is quite remote and can be dealt with upon equitable principles if the circumstances are truly compelling. Obviously this prospect did not disturb our Legislature when it adopted L. 1953 c. 264, . . . whereby it rejected the canon of testamentary construction [a prior decision] had applied and provided *without exception* that in the construction of any document thereafter executed an adopted child shall be deemed lawful issue unless the document shall otherwise provide. [Emphasis added.]

---

9. 1953 N.J. Laws, ch. 264, § 14, effective January 1, 1954.

The present status of Maryland law on this problem is as it was described by Halbach, *supra,* at 994. After referring to § 78 (c) and similar statutes, he stated:

These statutes essentially provide that adopted children are to be treated as natural-born children for purposes of ascertaining the meaning of private instruments, unless the terms of the instrument otherwise provide. Absent provision to the contrary on the face of the document, if a statute were enacted in this form the results of all cases would be specified in black and white. Both the desirability of such a proposed statute and the chances of its enactment are impaired by its unfortunate rigidity and its failure to come to grips with objections previously discussed. Room for exception is needed not only for what is stated in the instrument but also to deal with outside circumstances if the dangers of using adoption to manipulate succession are to be avoided.

If § 78 (c) is impaired by an "unfortunate" rigidity, the tasks of creating exceptions to it, and balancing the social considerations involved in any such revision, are for the General Assembly.

## IV

We reach the constitutional questions. Appellants contend that § 78 (c) retroactively divests their constitutionally protected property interests under Amos' will, or, if the statute is viewed as an evidentiary presumption, that its application is arbitrary in this case.

Analysis of the problem begins with what § 78 (c) does. The cases reviewed in Part III of this opinion give a partial picture of the agonizing of courts in construing legal instruments which were executed before adoption statutes were liberalized to permit inheritance through an adoptive parent and to provide for the adoption of adults. Where the maker of the instrument has not indicated an intent to have a term

used by him governed by future law, and if the matter is not otherwise directly governed by the later law, this Court has construed legal terms according to their meaning as commonly understood at the time the terms were utilized. *See Gutman v. Safe Deposit and Trust Co., supra,* and *Monroney v. Mercantile-Safe Deposit and Trust Co.,* [No. 12, September Term, 1981, decided October 15, 1981]. This approach gives to the term as broad or as narrow a meaning as it bore when used. It is one of the judicial rules of construction.

But where the ordinary legal meaning of a term at the time it is used does not embrace a situation which arises years later under a change in statutory law, it is conceivable that the term used was selected with such a possible, future situation in mind and for the conscious purpose of limiting the operation of the instrument short of the future possibility. On the other hand, the use of the term may not actually have been intended to exclude the future possibility from the operation of the instrument. In either event, the term utilized will not in and of itself control, if the intent plainly appears from the instrument as a whole.

One thing which the General Assembly has done in enacting § 78 (c) is to conclude, in cases involving certain generic terms and adoptions, that such a generic term, standing alone, does not clearly convey the maker's actual intent with respect to adoptees but that those terms, standing alone, are ambiguous. At this step the Legislature translates into a rule of law what it finds to be the common expectation and wish of persons generally. *See In re Coe, supra,* 42 N.J. at 489, 201 A.2d at 574. If the conclusion is that generally people actually intend adoptees to be included as "children," then the rule will be that, from the term "child," it is assumed, or presumed, that an adoptee is included, unless the contrary plainly appears from the other terms of the instrument. If the conclusion is that generally people do not intend adoptees to be included as "children," then the rule will be that, from the term "child," it is assumed, or presumed, that adoptees are excluded, unless

the contrary plainly appears from the other terms of the instrument. In Maryland, prior to 1947, the statutory presumption of inclusion operated only in the case of instruments executed by an adoptive parent as to that person's own adopted children. The 1947 revision extended the presumption "to any adopted person."

Essentially the foregoing analysis was applied in *Prince v. Nugent,* 93 R.I. 149, 172 A.2d 743 (1961), which involved a retroactive statute much like § 78 (c). That court stated that statutory rules of construction of testamentary instruments "do not constitute rules of substantive law but merely reflect conclusions of the legislature that are firmly based upon the generally known results of wide human experience." *Id.* at 160, 172 A.2d at 750. As to retroactivity, it held:

> It is our opinion then that the rule of construction prescribed in § 15-7-16 does not relate back to the creation of the trust here under consideration or give to the words therein employed by the settlor a different meaning from that in which he used them. It relates rather to the manner in which proof will be produced as to the intention with which the settlor employed such language at the time when the court seeks to determine that intention in construing the instrument.... "A statute which makes a new rule of proof acts prospectively, and with reference to the time when proof is to be made." For this reason we are persuaded that the statute does not operate retroactively to impair constitutional rights of any beneficiary. [*Id.* at 166-67, 172 A.2d at 753-54.] [10]

The same reasoning was applied by the United States District Court in *Purifoy* III where the court held (398 F. Supp. at 1084-85):

---

10. R.I. Gen. Laws § 15-7-16 (1956) was subsequently amended by 1966 R.I. Pub. Laws, ch. 211, § 1, to provide that the rule did not apply "in the construction of any instrument as to any child who is over the age of twenty-one (21) years at the time of his adoption and who is adopted after the death of the maker of such instrument."

In the opinion of this Court, Article 16, § 78 (c) is a rule of evidence and not a rule of substantive law. The statute does no more than create a rebuttable presumption that terms such as "child," "heir," "issue," and "descendant" include adopted persons. By the terms of the statute, any person aggrieved by this presumption may rebut same by introducing other evidence of a contrary intent plainly appearing from the terms of the instrument. Thus, the effect of Article 16, § 78 (c) is merely to establish a prima facie case in favor of the adopted child and to place upon those opposing inclusion of the adopted child the burden of going forward with evidence of a contrary testamentary intent. By allocating the burden of proof, the statute operates as a rule of evidence. [Footnote omitted.]

We agree with this reasoning. Because it creates an evidentiary presumption, § 78 (c) may constitutionally apply to instruments executed before its enactment. *Luria v. United States,* 231 U.S. 9, 26-27, 34 S. Ct. 10, 14-15, 58 L. Ed. 101, 107 (1913); *Thistle v. Frostburg Coal Co.,* 10 Md. 129, 145-46 (1856).

Nor, on its face, is the presumption of § 78 (c) an unconstitutional one. It clearly satisfies the test laid down in *Mobile, J. & K.C.R.R. v. Turnipseed,* 219 U.S. 35, 43, 31 S. Ct. 136, 138, 55 L. Ed. 78, 80 (1910):

That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate.

Here, the conclusion of the General Assembly that a testator's use of one of the designated generic terms is presumably intended to include adoptees, absent evidence of a

contrary intent, is not an inference which is " 'so strained as not to have a reasonable relation to the circumstances of life as we know them. . . .' " *United States v. Romano,* 382 U.S. 136, 139, 86 S. Ct. 279, 281, 15 L. Ed. 2d 210, 213 (1965) (quoting *Tot v. United States,* 319 U.S. 463, 467-68, 63 S. Ct. 1241, 1245, 87 L. Ed. 1519, 1524 (1943)).

The appellants urge, however, that there is no rational relation in this case between the fact proved and the fact presumed so that § 78 (c) is unconstitutionally applied here. In this case, all of the proof bearing on actual intent lies in the terms of Amos' will.[11] As to this aspect, the instant case is unlike one in which countervailing, affirmative evidence is presented to rebut a presumption. For this reason appellants attack at the constitutional level. They look beyond the relationship between "issue" and adoptees generally, to the particular adoptees here. They refer to the fact that adult adoptions were not part of the general law when Amos made his will and to the circumstances surrounding the adoptions by Rebecca. We assume, purely *arguendo,* that a rebuttable presumption, valid on its face, may be attacked as unconstitutionally applied in a given case. Here, the application is not irrational. We cannot say there is no reasonable relation to the circumstances of life rebuttably to presume from "issue" an intent to include adoptees without excluding persons adopted as adults, one of whom has from pre-teen years had a relatively close relationship with the adopting parent and the other of whom was a cousin of, and from childhood personally known to, the adopting parent.

Appellants also point to the 1961 amendment to § 78 (c) by which the presumption retroactively applies if the adoption was made after June 1, 1947. This is said to be arbitrary because it makes the date of adoption controlling, as opposed to the date of the instrument which is said to be critical as to intent. We disagree. Section 78 (c) undertakes to make intent controlling and provides a rebuttable presumption of

---

11. No question is presented here whether, for the purpose of overcoming the presumption, evidence bearing on the testator's intent which is derived from contemporaneous sources outside of the instrument must be admitted.

intent which is applicable here. In any event, appellants are not persons adversely affected by the absence of reference in the 1961 amendment to adoptions made prior to June 1, 1947 and have no standing to raise the issue.

> *Judgment of the Circuit Court for Cecil County affirmed.*
> *Appellants to pay the costs.*